## STATE, Respondent, *v.* CASARAS, Appellant.

(No. 7,638.)

(Submitted March 22, 1937.   Decided April 5, 1937.)

[66 Pac. (2d) 774.]

*Mr. John M. Lexcen,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, *Mr. Leif Erickson,* County Attorney of Richland County, and *Messrs. Farr & Farr,* of counsel for the State, submitted a brief; *Mr. Thompson* and *Mr. George W. Farr* argued the cause orally.

HONORABLE GUY C. DERRY, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, delivered the opinion of the court.

From an order of the district court of Richland county overruling his motion to vacate a judgment against him, to withdraw a plea of guilty to the information on which that judgment was based, and to permit him to enter a plea of not guilty, defendant has prosecuted an appeal to this court.

The defendant, Pedor Casaras, was charged in an information filed on the 2d day of July, 1936, with the crime of murder in the first degree. On the 6th day of July following he was brought before the court for arraignment. On being questioned by the court he stated that he did not have money to employ counsel, but that he wanted a lawyer, and the court thereupon appointed Carl L. Brattin, an attorney residing at Sidney, to represent him. Thereafter Mr. Brattin informed the court he would like to be relieved of the assignment, giving as his reason that the defendant demanded that he be tried by a jury, and that it was Mr. Brattin's view that in event the case was tried to a jury it would of necessity result in a verdict of guilty. The court granted the request and thereupon appointed John M. Lexcen, an attorney in Sidney, to represent the defendant. The record shows the following proceedings were then had:

"The Court. Very well, let the record show that John M. Lexcen is appointed as counsel in this case. I wish you would confer with the defendant, and as soon as may be done, a plea entered." A recess was thereupon taken, the length of which is not shown by the record except inferentially from a statement made by defendant's counsel at the time of argument on the motion, at which time he stated that "he still, after ten minutes or more of consultation, still wanted a trial by jury." Further proceedings are shown by the record:

"The Court. Are you ready to enter a plea?

"Mr. Lexcen. We are.

"The Court. What is your plea in this matter?

"The Defendant. Yes, I think.

"Q. You are charged here with murder. Are you guilty or not guilty? A. Yes.

"The Court. You had better have a conference with your client.

Later. "The Court. What is your plea in this case, guilty or not guilty?

"The Defendant. Guilty.

"The Court. We had better have a very clear understanding about this. Do you understand what the punishment is in this case? A. No.

"Q. You understand that the court may either sentence you to life imprisonment or to be hanged? A. What you say?"

The court at this time called for an interpreter who qualified only by saying that he had acted as an interpreter once in court. The court then proceeded through the interpreter with the following examination:

"The Court. You have pleaded guilty to murder in the first degree.

"The Defendant. Yes.

"Q. The punishment for murder in the first degree is either imprisonment in the state prison or death by hanging. A. Whatever you want to do.

"Q. I want you to understand exactly what the punishment is. A. I understand what you told me.

"Q. You understand that the court may either send you to the penitentiary for life or hang you? A. Yes.

"The Court. You explained that all to him, Mr. Lexcen?

"Mr. Lexcen. Yes.

"The Court. You are satisfied that he understands that?

"Mr. Lexcen. Yes.

"The Interpreter. *He said you are going to send him to the penitentiary for life. If he done something to be sent for you can send him.*

"The Court. Has there any promise been made to you by any one about what your punishment would be? A. No."

Following the entry of the plea as above outlined, the court examined a witness through the interpreter. He testified as to the circumstances under which the homicide charged to defendant had been committed. The county attorney made a brief statement of the facts as he understood them. After hearing this witness and the statements of the county attorney, the court set the following Monday as the time for pronouncing judgment. The record then shows this:

"Mr. Lexcen. Your Honor, will I at that time be privileged to go over the story to the court with the defendant so that the court may be apprised of just what the situation was as far as this man was concerned and what he believed to be sufficient provocation?

"The Court. No, you will do that right now."

Mr. Lexcen thereupon asked the defendant to tell why he killed the deceased. The defendant made a brief but rather unintelligible answer, from which it could be inferred that defendant believed that the deceased had violated the sanctity of his home. It should be particularly noted that the record does not show the complete statements made by the defendant. The court reporter's certificate covering the transcript of the proceedings states that he took in shorthand the proceedings at the time of the arraignment and plea of the defendant; that he

transcribed his notes of that proceeding, and "that the same as they appear on the preceding pages hereof are correct with this exception: that as to statements made by the defendant without the aid of the interpreter as same appear on pages 9 and 10 hereof these statements *were in part unintelligible to me,* but I took down in shorthand *what I could understand and have transcribed the same as I understood them."*

As a part of the record made at the time the motion was heard, the court caused the court reporter to be sworn and testify. Under examination by the court, the following questions were asked and the following answers given:

"Q. Did you take in shorthand all the proceedings in connection with that case that occurred in open court? A. I will have to qualify my answer. There are a part of the proceedings where the defendant made a detailed statement without the aid of the interpreter, a part of his statement was made in such broken English that I could not understand all of it. Outside of that I took all of the proceedings.

"Q. These two transcripts which I now hand you, do those contain a true record of all of the proceedings which you have mentioned? A. Yes, sir, with the exception which I mentioned. I might say that the part which I had excepted appears on pages 9 and 10.

"Q. The part which you refer to is the part wherein the defendant was making a statement without being questioned? A. That is true. I might say in addition that the part of his statement which I understood I took in shorthand and have correctly transcribed and that this transcript is a correct one of his statement in so far as I understood it."

At the time set for sentence no further evidence was taken. The court sentenced the defendant to death by hanging. In the remarks made by the court at the time of passing sentence, certain statements were made which might tend to indicate that it was unconsciously influenced by certain matters and facts which were developed in a former trial of the defendant on another charge and were heard before the same judge, and in

which case defendant was acquitted, and by other matters and facts which were outside the record in this case. Counsel for appellant has urged that the record shows that the court arrived at its decision to sentence the defendant to suffer the extreme penalty, for reasons and upon grounds that were not properly before it. In view of the disposition that we feel should be made of the case, it will be unnecessary to discuss this question.

On the 2d day of September following, a motion was made by defendant to set aside the judgment, to withdraw his former plea of guilty and permit a plea of not guilty. This motion was supported by affidavits, one of which was executed by the defendant, and one by John M. Lexcen, the attorney who had represented him at the time of arraignment. The pertinent facts as set forth in the affidavit of Mr. Lexcen were that he had been appointed by the court to act as counsel for the defendant; that following his appointment he and defendant had conferred in the chambers of Judge Leiper; that the defendant at that time stated that he would let the jury decide whether he was justified in committing the crime as charged; that (believing and relying upon the practice, custom, and general rule in the state of Montana) he advised the defendant that if the jury found him guilty they would leave the penalty to the judgment of the court, and that in such case the court would, following the general rule, sentence him, the defendant, to death; that at this time he advised the defendant that if he would put himself at the mercy of the court, the court would, in case the defendant entered a plea of guilty to the crime as charged, follow the usual practice and procedure, and sentence the defendant to life imprisonment in the state penitentiary or less; that the defendant after conferring further with him, asked what he would do if he was in the position of the defendant, to which he replied, "that he would plead guilty and take a life sentence rather than take chances on the jury."

Mr. Lexcen further deposed that the defendant is a Mexican and without education, and as such unfamiliar with court pro-

cedure and practice and custom; that, had he known that the extreme penalty of death would be given to the defendant, his advice would have been to plead not guilty and to offer testimony and proof to the jury in mitigation of punishment; *that defendant had asked to be tried by a jury both through his counsel first appointed by the court,* who later withdrew from the case, *and also through himself,* but that he made his plea of guilty relying upon counsel's advice, and that such advice was given because of the belief of counsel that a plea of guilty to the court would certainly result in a sentence of life imprisonment or less, and that the *defendant was misled as to the sentence that he was to receive.*

The affidavit of the defendant is to the effect that at the time of his arraignment the court appointed J. M. Lexcen as his counsel (after former counsel had withdrawn from the case); that he conferred with his counsel and that at that time "this defendant told J. M. Lexcen that he would go to trial before a jury of twelve men; that J. M. Lexcen informed this affiant that if a jury should find him guilty and leave the punishment to the court, the court *would have to sentence this affiant to death,* but that upon a plea of guilty to the court and by putting myself upon the mercy of the court, *the court would sentence me* to life imprisonment or less.  \*  \*  \*  The judgment of the court was that I shall hang by the neck until dead, which judgment was contrary to advice given me by my counsel, and had it not been for the advice of counsel I should have plead not guilty and asked for a trial by jury; *statements of counsel misled me* and resulted in a sentence of death."

The only construction that can be placed upon the situation here presented is that the defendant was not only advised, but urged, to plead guilty in the face of his determination to have a jury trial, and that his decision to plead guilty was made because he believed the statement of his counsel that a trial by jury would result in a sentence of death, while a plea of guilty would result in a sentence of life imprisonment. It may well be observed at this point that it is wholly immaterial what were

the reasons which actuated counsel in making the statements he did, or whether he had any right or authority to make such representations. It is undisputed that the statements were made. The only question here involved is whether the defendant, having been told in effect that if he stood trial by jury he would be hanged, and that if he pleaded guilty he would receive a life sentence, did believe and rely upon these statements made by his counsel and was thereby induced to make his plea. It may well be that the attorney was not justified in entertaining the belief he did, and likewise that there was no definite custom or practice followed in such cases upon which he purported to base his belief; but this does not change the situation as far as the defendant is concerned.

In determining the attitude of defendant, we should give some consideration to the fact that the attorney in this case was not one of defendant's own choosing. In open court, and in the presence of the defendant, his counsel was appointed by the judge. It may well be that the defendant, not being versed in the law or in the practice and customs of the court, felt that he could believe and rely upon any statement which such counsel would make, and might well believe that the attorney had authority to make statements, under such circumstances, that he did not in fact possess. When the defendant in this case was arraigned he asked to have the benefit of counsel. He was assigned counsel, and he informed his court-appointed attorney that he desired to have a trial by jury. He was advised to plead guilty, and upon his refusal to accede to such advice, his counsel withdrew from the case and another attorney was appointed to represent him. Again he insisted that he wanted to be tried by a jury, but he was persuaded against his own judgment to make a plea of guilty because of his court-appointed counsel's statement, which was tantamount to a threat that if he did not plead guilty he would surely be hanged, and that if he pleaded guilty he would receive a sentence of life imprisonment.

The proceedings connected with the arraignment and plea occupied a very short time, or at least such is the only inference that can be drawn from the record. It seems very clear therefrom that defendant, between the time he was arraigned and the time he made his plea, had talked to no one other than the two attorneys who had been appointed to represent him. As stated by his counsel at the time the motion to change his plea was heard, "the entire time spent in chambers was in an attempt to convince this man to plead guilty."

The defendant in a criminal case should not be persuaded to ▮▮▮ make a plea of guilty against his will. A plea of guilty should be entirely voluntary by one competent to know the consequences, and should not be induced by fear, persuasion, promise, or ignorance. (*State ex rel. Foot* v. *District Court*, 81 Mont. 495, 263 Pac. 979.) If there is any doubt that the plea is not voluntary, the doubt should be resolved in his favor. On application to change a plea, all doubts should be resolved in favor of a trial on the merits. (*State* v. *McAllister*, 96 Mont. 348, 30 Pac. (2d) 821.)

As a general observation, it might be remarked that attorneys appointed to defend those charged with crime should represent their clients with the same zeal and fidelity as though they were privately employed. The court should encourage full performance of their duty as lawyers, to the end that justice shall be done in all cases. The fee allowed by the state as compensation for the defense of pauper defendants is not in the nature of a reward to the attorney so appointed for obtaining a plea of guilty from his client. It might also be said that upon a plea of guilty that might result in a sentence of death, the ends of justice will be better served if an adequate inquiry is made into all the facts and circumstances which would have a bearing upon what punishment would be proper to be inflicted, and ample time taken for that purpose.

The plea in this case was made on the same day defendant was ▮▮▮ arraigned. The only evidence offered or received by the court was given at the same time. From the record, taken as a

whole, and with the circumstances shown, can it be said that this plea was entirely voluntary and made without inducement, and that therefore the death sentence should be allowed to stand and the defendant denied a trial on the merits? We think there is created a very grave doubt whether the defendant would have made his plea of guilty except for the assurance of his counsel that by doing so he would save himself from a death sentence and secure a sentence of life imprisonment. His statements made at the time of sentence (or such as the reporter was able to understand), under the conditions prevailing, considering his acknowledged lack of intelligence, do not overcome the positive statements made in the affidavits.

This court is committed to the rule that a plea of guilty, to stand, must be entirely voluntary and freely made, without inducement and without any procuring cause (*State ex rel. Foot* v. *District Court,* supra; *State* v. *McAllister,* supra), and that on application by the accused to change a plea of guilty to a plea of not guilty, all doubt should be resolved in favor of a trial on the merits, and that the trial court's discretion should be liberally exercised in favor of life and liberty (*State* v. *McAllister,* supra).

In view of the showing made, we think that the court abused its discretion in refusing to grant the motion. The judgment and order are reversed, and the cause is remanded to the district court of Richland county with direction to sustain defendant's motion.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, Dissenting:

I dissent from the opinion of the majority. The defendant was charged with the crime of murder. An attorney was appointed to defend him. He was advised by his attorney that if he would plead guilty and place himself at the mercy of the court, the death penalty would probably not be inflicted, but that if he insisted upon a jury trial and the jury found him guilty,

the court would direct an order fixing the death penalty. The statements by himself and counsel are not precisely to that effect but impliedly so, and at least the defendant in making his election well understood that there was doubt as to what would be the judgment as the result of his plea even if it were that of guilty. He knew he was taking chances, and now that the court has sentenced him to death, he asks to withdraw his plea and rely upon the sympathy of the jury instead of the judge. In other words, he gambled and lost, and now he wants to welsh. His attorney, in order to save his client's neck, now unselfishly attempts to assume the sole responsibility notwithstanding it clearly appears the defendant knew he was taking chances when he pleaded guilty.

Judge Leiper appreciated the fact that this was a cold-blooded murder without any reasonable excuse, and with full knowledge of the circumstances he undoubtedly believed that the maximum penalty was due the defendant. If the precedent is to be established that the most cold-blooded murderer may buy off the court by pleading guilty, it will seriously tend to diminish the fear of the death penalty by the most hardened criminals who, measuring the possibilities in advance, rely upon the practice to escape death for their crimes.

Judge Leiper undoubtedly measured all the facts and circumstances and considered the injustice of imposing the cost of giving this man a new trial before a jury just for the purpose of learning whether the jury or the judge would, after trial, remit the death penalty, but instead send him to the state penitentiary for life; in other words, the people of the county are to bear the expense of this gamble and become a loser in any event. The murderer has all to gain and nothing to lose. If this practice proposed in this case is to be approved by this court, it amounts to notice to all attorneys that they may advise their clients, and the layman may depend on the principle, that the man who commits a most cold-blooded murder may plead guilty and need not hang for the crime but instead get a penalty for life with a hope for future clemency. I cannot subscribe to that principle or

practice, and, therefore, dissent from the order allowing this defendant to withdraw his plea of guilty so that he may thereby get another chance.