[Civ. No. 9369.   Third Dist.   Jan. 19, 1959.]

AMARYLLIS L. CARDEN, Respondent, v. MORRIS CARDEN, Appellant.

Rodegerdts & Means, E. L. Means and Oliver J. Northup, Jr., for Appellant.

J. A. Montgomery, Jr. and Richard A. Case for Respondent.

VAN DYKE, P. J.—This action was brought by Amaryllis L. Carden, hereinafter called "Amaryllis," against Morris Carden, hereinafter called "Morris," to obtain a decree that whatever apparent interest Morris had in certain real property he held in trust for Amaryllis. Morris cross-complained, asking that it be decreed he was the owner of one-half interest in the property and that Amaryllis should account to him for its use. The trial court decreed that Amaryllis was the sole owner of the property and from that judgment Morris appeals.

On January 6, 1934, R. E. Carden, hereinafter called "Robert," and appellant, who were brothers, entered into a contract with P. N. and Mamie C. Ashley, whereby they agreed to purchase the real property involved in this action. Amaryllis, through the death of Robert, her husband, has succeeded to Robert's interest. Robert and Morris made an initial payment of $1,750, each contributing one-half. At that time they were and for several years had been partners in rather extensive farming operations. Morris has claimed herein that they contracted to purchase the property as partners and that their interest therein was a partnership asset. Amaryllis has disputed this and the trial court found in her favor on that issue. In the latter part of 1937, the brothers dissolved their partnership and divided the partnership assets between themselves save that there was no express agreement distributing whatever interest each may have had in the subject real property. Robert continued to occupy and to farm the property until his death in 1951, after which Amaryllis occupied and farmed it. She and Robert made all the payments on the contract purchase price after the partnership dissolution and she alone made the payments after Robert's death. Full payment having been made, the Ashleys executed a deed to Amaryllis and to Morris "as their interests may appear." Thereafter, Amaryllis began this action.

The trial court made the following findings of fact: The purchase price of the property was $35,000, payable $1,750 upon execution of the agreement and the balance, together with interest on deferred payments at 6 per cent, was to be paid in the following manner: The contract required of

Robert and Morris that they crop the land in 1934 to sugar beets and deliver to the Ashleys one-fourth of the amount received upon sale of the crop, to be credited first on interest due and second on principal. Robert and Morris were bound after 1934 to crop the land each year and pay over one-fourth of the amount of the crops. The buyers had the right to cover crop and the sellers agreed to waive interest as to the acreage planted to cover crop up to a full year's interest. The entire purchase price was to be paid in 20 years. Robert and Morris took possession of the land and farmed the same together through the year 1937. During that period they paid on principal and interest $4,777.59, of which $919.77 was credited on account of principal. At the end of 1937, Morris quit possession of the property and thereafter did not perform any of the obligations of the contract. After 1937 he never went upon the property, never participated in any way in the farming or management of it, never paid anything on taxes, principal or interest, nor for farming expenses. He paid no cost of the leveling done by Robert. From the time he quit possession, Morris considered the responsibility for the performance of the terms, conditions and obligations of the contract, together with the responsibility for carrying on farming operations, to be that of Robert alone. Robert, from 1937, and until he died December 1, 1952, remained in the sole actual possession of the property, performed all the terms and conditions of the contract, paid all taxes and carried on and conducted all farming operations. From 1937 until he died, Robert paid on the purchase price, without any contribution from Morris, $14,-327.22 and $10,017.77 interest. Amaryllis, as successor to Robert after his death, remained in the sole actual possession of the property, carried on the farming operations, managed and supervised the property and paid on the principal $17,-038.24 plus interest in the sum of $321.66. Robert expended on leveling the property the sum of $9,279.46. Robert and Amaryllis paid in taxes the total sum of $9,441.49. On January 17, 1955, Amaryllis paid the Ashleys $6,494.76, which was the final payment for the property and on January 24th following the Ashleys executed their deed as heretofore stated. The reasonable market value of the property as of October 30, 1956, was the sum of $125,000. The increase in the market value resulted from the work, labor and efforts of Robert and of Amaryllis and from changes in economic conditions subsequent to 1937 and was not attributable to anything done by Morris. The partnership was finally wound up and dissolved

in 1938. During the winding up proceedings Robert and Morris divided the partnership property and assets then remaining between themselves, but did not enter into any agreement concerning their respective rights and obligations in and to the said contract of purchase or in and to the real property described therein. From 1937 until the death of Robert, Morris asserted no claim to the property, never offered to pay to Amaryllis one-half of the amounts put out by Robert and herself in acquiring the property and, more specifically, had never offered to repay one-half the taxes or one-half the cost of leveling the property. He did, however, offer to pay her one-half the amount of the final payment she made on the purchase price. That was the only offer he made to share in the cost of acquisition. This offer Amaryllis refused. Morris, from the year 1937, knew that up to the time of his death Robert had been in the sole actual possession of the property and had during all of that time farmed and managed the same and carried on the farming operations thereon by himself alone. He knew or could have ascertained that after the death of Robert, Amaryllis had been in the sole actual possession of the property and by herself alone had managed it and carried on all farming operations. Morris, from 1937 until the death of Robert, had never demanded any accounting of the farming operations from Robert. Thereafter, he never demanded from Amaryllis any account of payments she had made to acquire the property. The foregoing findings are substantially supported by the evidence.

By his answer and cross-complaint Morris pleaded that when the partnership had been dissolved he and Robert had orally agreed Robert would perform all the obligations of the contract of purchase in consideration of Morris's relinquishing to Robert his one-half share of the profits in excess of the payments that had to be made; that all payments made by Robert on the contract were to be made for the benefit of both. The court found no such agreement had been made. This finding, too, is supported.

The court concluded from the foregoing findings that Amaryllis was the owner in fee of the real property; that Morris had no right or interest therein or claim thereto and that whatever apparent title or interest he acquired by the deed and from the Ashleys he held in trust for Amaryllis with the obligation to convey to her; that he had released, relinquished, or abandoned whatever interest he had; that the deed from the Ashleys to Morris and Amaryllis did not operate

to vest any title in Morris; and that Morris ought to be decreed to convey the property to Amaryllis, failing to do which the clerk of the court should convey for him. Judgment was entered accordingly.

The course of reasoning appearing in the trial court's memorandum of decision whereby the trial judge arrived at his conclusion that Morris had abandoned his interests is so cogent we wish to quote therefrom even at the expense of some repetition:

''Let us not forget that the contract for the purchase of the property in question was entered into between R. E. and Morris Carden with Mr. and Mrs. Ashley on January 6, 1934, which was right at the worst of the depression. Money was scarce and farm products were very cheap. After the contract was executed and the purchasers had made their down payment of $1,750.00 they must have decided that they made a bad bargain for on the same day they prevailed upon the Ashleys to execute a supplemental agreement providing that the purchasers should have until the 15th day of August 1935 to cancel and rescind the contract by giving written notice to the Ashleys of their election to rescind. In the event of such rescission the purchasers were to deliver one-fourth of the crop grown on the property and could recover the $1,750.00 made by them as a down payment.

''The plaintiff testified that the property had been planted year after year for so long to grain without crop rotation that the land had lost its fertility. Her statement is corroborated by a provision in the contract of purchase which provides: 'It is further understood and agreed between the parties hereto that when, as and if a cover crop is put in all or a part of this land then in that event the interest will be waived by parties of the first part as acreage planted to said cover crop bears to the total interest due until a full year's interest has been waived by parties of the first part, and the one-fourth return from the crops as herein described shall be applied to the principal of said indebtedness.'

''The plaintiff's testimony that the land was not productive is further corroborated by the small amount the purchasers were able to pay on the purchase price of the land during the four years they farmed it together. It will be remembered that they farmed it together in the years 1934, 1935, 1936 and 1937. Under the terms of the contract they were to farm the land and deliver one-fourth of the crop of sugar beets or one-fourth of such other crops as they may grow on the property

to the sellers' account and pay the taxes assessed against the land. From the proceeds derived from their one-fourth of the crops the sellers were to credit the purchasers first on the interest which had accrued at six per cent and the balance on the purchase price.

"The exhibits of both parties in evidence show that from the farming operations by the purchasers for the four years up until the time they dissolved and terminated the partnership they were only able to pay on the purchase price the sum of $1,839.54. Add to that the $1,750.00 paid on the purchase price and you have the total sum paid on the purchase price at the time the partnership was terminated. The total sum paid was $3,589.54. One-half of that sum is $1,794.77 or the value of the defendant's equity when he abandoned the property and ceased to perform under the contract of purchase. At that time there was still a balance owing on the purchase price of $31,410.46. During the four years R. E. and Morris Carden farmed the land they paid the interest which amounted to $7,715.65. In addition to that the purchasers were required to pay and did pay the taxes levied against the land. Under the terms of the contract the purchasers were required to pay the entire principal within 20 years from the date of the contract.

"For the four years the purchasers farmed the land they were only able to pay on the purchase price at the rate of $459.88 per year. After deducting the down payment of $1,750.00 from the purchase price of $35,000.00, we have a balance of $33,250.00. To pay that sum at the rate of $459.88 per year would have required 72.33 years. Morris Carden could plainly see that with the yield the land was producing and with the prices the produce was bringing they could not possibly pay for the land in 20 years from the date of the contract and there was no provision in the contract for an extension of time for performance. In addition to the requirement to pay interest at six per cent and the taxes, the purchasers were required to keep the well on the premises in good condition, state and repair at their expense and keep the premises free from noxious weeds at their expense.

"The foregoing evidentiary facts is not only corroborative of the plaintiff's testimony that the land had lost its fertility but it is conclusive evidence not only of the fact that the defendant waived and relinquished his rights in the land under the contract with the Ashleys to R. E. Carden but why he did so.

"The defendant testified that after the year 1937 he never set foot on the property; that he never made any recommendations to R. E. Carden as to how the land should be farmed; that he made no objections to R. E. Carden as to the way he was farming the land; that he made no recommendations to R. E. Carden as to how he should comply with the Ashley contract; that he did not pay one cent of the taxes, one cent of the interest, one cent of the principal, and that he did absolutely nothing toward complying with the terms of the contract of purchase. He testified that he considered those matters Bob's responsibilities.

"The defendant testified that they were Bob's responsibilities because of the agreement he had with Bob after the dissolution of the partnership. This agreement has already been set forth. Of course it is fantastic. He knew only too well that there would be no profit for Bob from the farming operations after Bob had complied with the terms of the contract of purchase and he knew only too well that owing to the condition of the land and other prevailing conditions that Bob could not comply with the terms of the contract of purchase. Moreover, he knew that Bob was as well aware of those facts as was he.

"The plaintiff testified that R. E. Carden (Bob) realized that in order to restore fertility to the soil and make it more productive it was necessary to plant the land to alfalfa. In order to do this successfully it was necessary to level and check the land so as to make it irrigable. This he proceeded to do at a cost to him of $9,279.46, which he paid. It was stipulated at the trial that from 1938 to date R. E. Carden and the plaintiff expended in the payment of taxes on the land in question the sum of $9,441.49. The evidence shows that to complete the purchase of the land, R. E. Carden and the plaintiff expended the total sum of $66,124.41, whereas subsequent to the year of 1938 the defendant expended nothing.

"R. E. Carden died December 1, 1952. The defendant, in 1938, had the same right to enter upon the real property in question and perform under the contract of purchase and acquire by purchase an undivided one-half interest in the property as did R. E. Carden. Yet by his own testimony he did nothing toward that end. He testified that he made no claim on the property until after R. E. Carden's death. Thus for 15 long years he did not move a finger insofar as effort is concerned nor did he expend one cent to acquire his one-half interest in the land.

"Under the terms of the contract of purchase with P. N. and Mamie C. Ashley the defendant could not be compelled to perform or be held liable for any more than he had expended prior to 1938. The only recourse the Ashleys had under the contract was to retain what had been paid them as rent, terminate the contract and repossess the property.

"It is very apparent from the evidence in the case that the defendant considered that he had made a bad bargain; that acquiring the land by performance of the Ashley contract was not worth the effort and that rather than put forth any further effort or expenditure he would sacrifice what he had expended toward the purchase of the land prior to 1938.

"It was stipulated at the trial that the present value of the land is $125,000.00. This is due solely to the efforts of R. E. Carden subsequent to the year 1938 and the change in economic conditions. It is not due to any effort of the defendant."

In addition to the matters commented upon by the trial judge in the foregoing quotation, it appeared in the testimony that, although asserting at the trial he at all times had an equal interest with Robert in the real property being purchased, Morris never at any time reflected such claim in his income tax returns. He never called upon either Robert or Amaryllis for information as to what amount, if any, he should return as income and pay a tax upon. It also appeared that at the dissolution of the partnership Morris tried to sell to Robert his interest under the contract, but Robert would not buy.

We think the trial court properly found that Morris abandoned his interests and that Robert took over. ▉ Abandonment of a right or property is the voluntary relinquishment thereof by its owner with the intention of terminating his ownership, possession and control and without vesting ownership in another person. (1 C.J.S., Abandonment, p. 4.)
▉ Intent to abandon is generally a question of fact (*Wiltsee* v. *Utley*, 79 Cal.App.2d 71, 77 [179 P.2d 13]), and may be inferred from conduct. (1 C.J.S., Abandonment, p. 12.)
▉ Under the common law any title to or interest in land other than a fee simple may be abandoned. (1 C.J.S. p. 12.) Equitable rights in land may be abandoned. (*Id.*) The facts amply support the trial court's conclusions.

▉ The result of what has been said is that the equitable title to the land was in Amaryllis when she completed the payments, but by virtue of the existing written contract an ap-

parent title rested in Morris. Reasonably enough, the Ashleys would not assume the risk of conveying to Amaryllis alone lest they be subject to the claims of Morris, which by that time he was asserting. Amaryllis was compelled to accept from them the form of conveyance they were willing to execute, that is, a deed conveying to her and to Morris "as their interests may appear" or to litigate with the Ashleys and Morris. She elected to accept the deed and to establish her rights as to Morris. The situation then was that she was entitled to the equitable decree she received. Morris was by then a mere interloper seeking to capitalize on a bare legal title. It makes no difference whether the theory of the decision be that of a "purchase money trust" (Civ. Code, § 853; Bogert on Trusts and Trustees, vol. 2A, p. 419 et seq.) or of a constructive trust (Civ. Code, § 2223; Bogert, vol. 3, p. 3 et seq.). The technical differences between the two are immaterial here. It is equally immaterial if we assume, as argued by counsel for appellant, that the purchase of the land was a partnership venture, for the evidence would support a finding that Morris's interest after dissolution was abandoned. The judgment is based on abandonment.

For the reasons given, the judgment is affirmed.

Peek, J., and Warne, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 18, 1959.

*Assigned by Chairman of Judicial Council.