[Civ. No. 22596.  First Dist., Div. One.  Feb. 8, 1966.]

ANN HUNTER, Plaintiff and Respondent, v. HILDEGARD J. SCHULTZ, Defendant and Appellant.

Eugene K. Lawlor for Defendant and Appellant.

C. O. Heffernan for Plaintiff and Respondent.

SULLIVAN, P. J.—This is an appeal from an interlocutory decree[1] entered in an action to partition real property.

Plaintiff Ann Hunter, also known as Ann Schultz (Ann), and defendant Melvin Schultz (Melvin) were married in 1946 in Cleveland, Ohio. In 1947 they moved to California. In 1950 they acquired as joint tenants the subject real property consisting of a single-family residence in San Leandro. They lived together on the premises until 1951.

In August 1951 Ann amd Melvin separated and Ann commenced an action for divorce in Alameda County. She then went to Cleveland but returned to California in December 1951, whereupon the parties resumed living together on the property. In February 1952 Ann discovered that on the very day she had returned to California, Melvin had obtained a decree of annulment on his cross-complaint filed in the divorce proceedings.[2] The parties again separated and Ann left the San Leandro home, never occupying it thereafter. At about this time, May 1952, she made several requests of Melvin that they "split everything fifty-fifty" but the latter would never agree. Three months after she moved out, Ann renewed this request by telephone but Melvin refused, "got nasty and I hung up." After her departure, she paid nothing on the mortgages, taxes, insurance, repairs or improvements on the property.

Melvin continued to live on the property and maintained it by himself until November 1954 when he married defendant and appellant Hildegard Schultz (Hildegard). Thereafter Melvin and Hildegard jointly occupied, maintained and improved[3] the property. However, difficulties arose between Melvin and Hildegard and so, with a view toward a divorce, Hildegard telephoned Ann in August or September of 1962 to discuss the possibility of the latter's initiation of partition proceedings. Although informing Hildegard that she herself could initiate the proceedings since she had a one-fourth

---

[1]Such a decree, although interlocutory, is nevertheless appealable (Code Civ. Proc., § 963, subd. 2) regardless of whether partition is ordered in kind or, as here, by sale of the property and division of the proceeds. (*Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 242, fn. 1 [40 Cal. Rptr. 189].)

[2]On the ground that Ann had not been validly divorced from her first husband when she married Melvin.

[3]Some of the additions testified to by Melvin include the remodeling of the kitchen and bathroom; the conversion of the garage into a bedroom; the addition of electrical installations; the installation of a utility building, a carport and fencing; and some landscaping.

interest in the property, Ann nevertheless agreed to initiate the action in partition giving rise to the instant appeal.[4]

On October 13, 1962, Ann filed the instant complaint[5] alleging that she, Melvin and Hildegard were owners of the property as tenants in common, Ann owning an undivided one-half interest therein and Melvin and Hildegard each owning an undivided one-fourth interest; and that Melvin and Hildegard were in possession of the premises. In their answer defendants admitted ownership and possession in themselves but denied all other material allegations. In addition, they set forth separate and distinct defenses alleging in substance that Ann had abandoned the property; that defendants had made expenditures to improve the property and to preserve it from sale under deeds of trust; that Ann had been guilty of laches; and, by way of cross-complaint, that defendants were, and for a long time had been, owners and in possession, the plaintiff having no right, title or interest whatsoever.

The trial court ordered that the property be sold and that the proceeds of the sale be applied in the following order: (a) in payment of all liens and encumbrances against the property; (b) $5,242.10 plus all payments made after December 1, 1963, on the principal of the loans to defendants; (c) one-half of the balance to plaintiff and the other half to defendants. The court found and concluded that defendants did not possess the property adversely to plaintiff; that plaintiff did not abandon the property; and that plaintiff was not barred by laches. The interlocutory decree was entered accordingly. From such decree Hildegard only, and not Melvin, has taken this appeal.

Notwithstanding the court's findings and conclusions on the issues of abandonment and adverse possession, counsel for Hildegard advised us at oral argument that appellant's

---

[4]It is not clear from the record exactly how Hildegard acquired her one-fourth interest. At oral argument counsel for the parties advised us that, as Hildegard's answer asserts, Melvin executed and delivered a quitclaim deed to Melvin and Hildegard.

[5]The complaint in partition named as defendants, in addition to Melvin and Hildegard, Western Title Guaranty Company, a corporation, and the Prudential Insurance Company of America, a corporation. As to Western Title Guaranty Company, a default judgment was entered. As to Prudential, attorneys for both plaintiff Ann and defendants Melvin and Hildegard stipulated that it need not be required to file an answer or otherwise take part in the proceedings. It was further stipulated that Prudential was the beneficiary under two deeds of trust covering the real property herein involved; also that no judgment should be entered in the litigation ordering or providing that the property be sold unless it provided that it be sold subject to the liens of Prudential.

contentions on appeal were not directed to these points. Indeed no tenable arguments could be advanced on such bases. ██ The rule is long and well settled that a title in fee cannot be divested by abandonment. (*Ferris* v. *Coover* (1858) 10 Cal. 589, 631; *Davenport* v. *Turpin* (1872) 43 Cal. 597, 602[6]; *Northern Assurance Co.* v. *Stout* (1911) 16 Cal. App. 548, 557 [117 P. 617]; *Kern County Land Co.* v. *Nighbert* (1925) 75 Cal.App. 103, 106 [241 P. 915]; *Carden* v. *Carden* (1959) 167 Cal.App.2d 202, 209 [334 P.2d 87]; 1 Cal.Jur.2d, Abandonment, p. 9; 1 Am.Jur.2d, p. 14; 1 C.J.S., pp. 13-14; 4 Tiffany, Real Property (3d ed.) p. 28.)

██ As to adverse possession, the rule is clear that one tenant in common cannot acquire the title of his cotenant by mere exclusive possession. ██ Recently in *Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 242-243 [43 Cal.Rptr. 364], we had occasion to summarize the applicable principles thusly: "It is settled law that the exclusive occupancy of jointly owned premises by a cotenant is deemed permissive and does not become adverse until the tenant *out of possession* has had either actual or constructive notice that the possession of the cotenant is hostile to him. [Citations.]" We there quoted from *Wilkerson* v. *Thomas* (1953) 121 Cal. App.2d 479, 488 [263 P.2d 678] as follows: "Before title may be acquired by adverse possession as between cotenants, the occupying tenant must bring home or impart notice to the tenant out of possession, by acts of ownership of the most open, notorious and unequivocal character, that he intends to oust the latter of his interest in the common property. [Citations.] Such evidence must be stronger than that which would be required to establish a title by adverse possession in a stranger. [Citations.]" ██ The record in the instant case supports the court's finding that defendants did not bring home to Ann notice that their possession of the premises had become hostile and that they intended to oust her from any ownership.

██ However, Hildegard claims that Ann is barred by laches. The court found that "neither of the defendants suffered any damage or detriment by reason of plaintiff's failure to commence this action before she did" and concluded that "plaintiff was not guilty of laches in failing to bring this action before she did." Appellant's contention on this point is not clear-cut when considered in the present posture of the case and the applicable rules of appellate review. The gist of

---

[6]Overruled on other grounds in *Burns* v. *Hiatt* (1906) 149 Cal. 617, 625-626 [87 P. 196, 117 Am.St.Rep. 157].

her argument seems to be this: that she and Melvin would not have maintained, improved and invested their money in the property "had they known that one-half of it belonged to the respondent"; that if Ann had pursued her rights when she married Mr. Hunter in 1952, Hildegard "would not have suffered the injustice wrought by the decree of partition"; and that if Ann had not slept on her rights, Melvin and Hildegard "could have protected themselves" by keeping accurate records of their expenditures in improving the property. In essence the claim appears to be made that no substantial evidence supports the trial court's finding. It is to be noted that appellant must set forth in her briefs all of the evidence on this point, and not merely her own proofs. (See *Davis* v. *Lucas* (1960) 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479].)[7]

We said in *Marshall* v. *Marshall* (1965) 232 Cal.App.2d 232, 251-252 [42 Cal.Rptr. 686]: "As the court said in *Butler* v. *Holman* (1956) 146 Cal.App.2d 22, 28 [303 P.2d 573], cert. denied 353 U.S. 930 [77 S.Ct. 718, 1 L.Ed.2d 723], 'Laches is an unreasonable delay in asserting a right which causes such prejudice to an adverse party as renders the granting of relief inequitable.' The question of laches is one for the determination of the trial court in the light of the facts and circumstances of the particular case and its conclusion thereon will not be set aside by an appellate court if there is substantial support for it in the evidence. [Citations.]"

The record discloses substantial evidence supporting the above finding. Melvin, of course, knew all along that Ann had an interest in the property. Hildegard admitted under cross-examination that she learned of Ann's interest "two or three years" after her marriage to Melvin in 1954. It is clear that defendants knew of Ann's interest when they made the improvements to the property. It is also clear that Ann did not know that the improvements were being made to the property but saw them for the first time when Hildegard invited her to the house after her first communication with and visit to Ann's house in August or September of 1962. Nor is Hildegard correct in her argument that she and Melvin heard nothing from Ann between August 1952 and the commencement of these proceedings in October 1962. Melvin testified under cross-examination that in 1957 he attempted

---

[7]Appellant's statement of facts in her opening brief covers only one and a half pages.

to get a construction loan on the property but was unable to do so because Ann was one of the owners of record; that he then attempted through one Combs to get a quitclaim deed from Ann; and that she refused to sign it. He did not tell Ann he was making improvements on the property. We think that on this evidence the court was warranted in concluding that neither of the defendants suffered damage because of Ann's conduct.

Finally, Hildegard contends that the court erred in allowing reimbursement to defendants of only $5,242.10 (plus loan payments made after December 1, 1963) before dividing the proceeds of the partition sale equally between plaintiff on the one hand and defendants on the other. The above amount of $5,242.10 is the total of all payments made by defendants on the principal of the loans on the property ($3,380) plus the amount expended by them for improvements ($1,862.10).[8] Hildegard complains that the ordered reimbursement is too low for two reasons: (a) While the court found defendants had paid $6,257.86 for interest, taxes and insurance (see fn. 8, *ante*), it did not allow these payments to defendants but found that they were offset by the value of the use of plaintiff's interest in the property.[9] (b) The only testimony as to the value of the improvements was between $4,000 and $5,000. We consider these points in the order presented.

It is urged that it was clearly error to allow plaintiff to collect a "rental allowance" from her cotenants in exclusive possession of the property, particularly when the latter had never received any rent from other persons for the property. While we are in accord with defendant as to the settled rule that, in the absence of agreement between them, one tenant

---

[8] The court found that when they purchased the property, Ann and Melvin incurred purchase money obligations secured by two deeds of trust; that Melvin and Hildegard made payments of principal and interest on said obligations, as well as payments for taxes and insurance, from the time plaintiff vacated the premises until the time of trial; that the principal payments totalled $3,380; that the payments of interest, taxes and insurance totalled $6,257.86; and that defendants expended $1,862.10 for improvements increasing the value of the property.

[9] The pertinent finding states: "That the value of the use of plaintiff's interest in the subject property is equal to the sum of the payments by defendants for interest, taxes and insurance made by defendants in the preservation of said property."

There was testimony that the rental value at the time of the trial (November 1963) was approximately $110 per month; and that it was probably lower during the 11 years preceding the commencement of the action inasmuch as over this period of time rental values had increased at a rate of about 4 percent per year.

cannot maintain an action against his cotenant in exclusive possession to recover rent for the latter's occupancy of the property (*Pico* v. *Columbet* (1859) 12 Cal. 414, 419 [73 Am. Dec. 550]; *Black* v. *Black* (1949) 91 Cal.App.2d 328, 332 [204 P.2d 950]; *Nevarov* v. *Nevarov* (1953) 117 Cal.App.2d 581, 585 [256 P.2d 330]; *Rutledge* v. *Rutledge* (1953) 119 Cal.App.2d 114, 120 [259 P.2d 79]; *Brunscher* v. *Reagh* (1958) 164 Cal.App.2d 174, 176 [330 P.2d 396]; 4 Powell on Real Property, p. 603), we disagree with defendant's characterization of the offset ordered by the court below as "rent" within the meaning of the above rule.

In an annotation in 51 A.L.R.2d 388 on the accountability of cotenants for rents and profits or use and occupation, it is stated at page 454: "The later cases amply show that when, in a suit for partition or a sale for division, or other proceeding between cotenants in equity or in which equitable powers may be exerted, a cotenant who has been in possession or use of the premises seeks to obtain contribution respecting improvements made, or *amounts expended in protection or preservation of the property,* the court, as incidental to the granting of such relief and by way of adjusting the rights of the parties, may charge the claimant, defensively, with at least a part of the reasonable value of his occupancy or use, and in some cases may hold him accountable for profits realized from the premises, even though he could not otherwise be required to account or be held liable respecting any of such benefits." (Italics added.) In support of such a rule cases are cited and digested from several other jurisdictions, including Alabama, Florida, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Texas, Washington, Wisconsin and Canada. No California cases are cited; nor has our independent research disclosed any reported California decision following such a rule.

In *Buttram* v. *Finley* (1946) 73 Cal.App.2d 536, 544-545 [166 P.2d 654], it was said: "In partition suits between tenants in common, the subject of allowances of enhanced value of the real property by virtue of alleged improvements thereon, and of the right to offset such allowances, if any, by the rents and profits derived, has been frequently considered by the courts and text writers. [Citations.]"[10] An examina-

---

[10]Citing, *inter alia,* the following: *Ventre* v. *Tiscornia* (1913) 23 Cal. App. 598 [138 P. 954]; *Gerontopoulos* v. *Gerontopoulos* (1937) 20 Cal. App.2d 261 [66 P.2d 774]; *McWhorter* v. *McWhorter* (1929) 99 Cal.App. 293 [278 P. 454]; *Goodenow* v. *Ewer* (1860) 16 Cal. 461 [76 Am.Dec. 540]; *Pico* v. *Columbet, supra,* 12 Cal. 414.

tion of the cited cases (see fn. 10, *ante*) satisfies us that the language "rents and profits derived" had reference to rents derived by the tenant in possession from third persons and that the cited cases did not involve the offsetting of the value of the interest of the tenant *not* in possession. In *McWhorter* v. *McWhorter* (1929) 99 Cal.App. 293 [278 P. 454], cited in *Buttram*, the appellate court modified a decree in partition by striking therefrom an award to the tenant out of possession as rental value of the property. However, so far as the opinion discloses, the decree in *McWhorter* did not make provision for repayment to the tenant in possession for amounts expended by him in improving, protecting or preserving the property so that the question of *offsetting* rental value as distinguished from awarding it outright does not seem to have arisen.

We are persuaded that the rule stated in the foregoing annotation (51 A.L.R.2d 388, 454) and applied in the other jurisdictions therein referred to is sound, just and consonant with equitable principles. It has received the recognition of respected authorities. (20 Am.Jur.2d, Cotenancy and Joint Ownership, p. 135; 68 C.J.S., Partition, § 141, pp. 230-231; see 51 A.L.R.2d 388, 454-462 and cases collected and digested therein.) It was undoubtedly applied by the learned trial judge in this case and, we think, properly so.

Nor are we persuaded to the contrary by appellant's argument that the payments of interest, taxes and insurance, having been required by the note and deed of trust, constituted payments of the purchase price entitling her to an accounting. The annotation to which we have already referred continues: "Among the later cases various instances have occurred in which cotenants invoking the jurisdiction of an equity court to obtain contribution for *maintenance or protective expenditures* on the common property have been subjected to defensive allowances of the whole or a proper proportion of the reasonable value of their occupancy or use." (Italics added.) (51 A.L.R.2d at p. 455.) This statement is well buttressed with decisions from nine jurisdictions allowing offsets for mortgage interest and principal, taxes and insurance.

We conclude that in the instant action it was proper for the court to offset the reasonable value of the use of plaintiff's interest in the property against the payments for interest, taxes and insurance made by defendants in preservation of the property.

We now turn to Hildegard's second objection. As we have said, the court found that defendants expended the sum of $1,862.10 for improvements which increased the value of the property and allowed defendants said amount. Hildegard claims that this was error since the only testimony in the record was that of Melvin who, after describing the improvements (see fn. 3, *ante*), stated as his "best estimate" that the materials alone, exclusive of labor, cost "in the neighborhood of four to five thousand" dollars. Hildegard argues in effect that the trial judge was required to accept this figure. We disagree.

We said in *Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 281 [25 Cal.Rptr. 837] : "As a general rule, the unimpeached and uncontradicted testimony of a witness, not inherently improbable, cannot be arbitrarily disregarded and should be accepted as true by the trier of fact. [Citations.]" We there observed that such rule was subject to many exceptions established in the decisions, among which were *Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147], and *Quock Ting* v. *United States* (1891) 140 U.S. 417, 420-421 [11 S.Ct. 733, 851, 35 L.Ed. 501], and the leading case of *La Jolla Casa deManana* v. *Hopkins* (1950) 98 Cal.App.2d 339, 345-346 [219 P.2d 871]. We quoted from *La Jolla* as follows: "[A] trial judge has an inherent right to disregard the testimony of any witness, or the effect of any prima facie showing based thereon, when he is satisfied that the witness is not telling the truth or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness. All of these things may be properly considered in determining the weight to be given the testimony of a witness although there be no adverse testimony adduced. The trial judge is the arbiter of the credibility of the witnesses. A witness may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story. His manner of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts." It was therefore our conclusion in *Camp* that "the trier of fact, as the exclusive judge of the credit and weight to be given to the testimony of a witness, may reject such testimony even though uncontradicted and unimpeached when he does not act arbitrarily but does so

upon sound and relevant considerations such as those enumerated above. [Citations.]'' (209 Cal.App.2d at p. 283.)

We are satisfied that the above principles control here. The trial judge was justified in considering that Melvin, as a one-fourth owner and as the spouse of another one-fourth owner, had an obvious interest in the amount to be allowed for improvements. The credibility of Melvin's testimony could also properly be weighed in the light of the circumstance that he could produce receipts for only $1,862.10 of the claimed expenditures but could not produce any kind of corroborative evidence in verification of the claimed balance. The trial judge observed the witness on the stand, was in a far better position that we are to evaluate the trustworthiness of his ''best estimate,'' and in the final result was the arbiter of his credibility. (*La Jolla Casa deManana* v. *Hopkins, supra.*) We find no error in the court's partial acceptance of Melvin's testimony.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.