[Civ. No. 25293. First Dist., Div. Two. June 17, 1969.]

MARIE SNELL, Plaintiff and Appellant, v. DERKJE J. TELEHALA, Defendant and Respondent.

62

Alfred Nelson for Plaintiff and Appellant.

Thomas D. Geary and Anderson & Geary for Defendant and Respondent.

AGEE, J.—By deed dated December 4, 1952 and recorded on December 10, 1952, plaintiff and her husband became and ever since have been the record owners of a parcel of realty in Lake County. The deed names the grantees as ''William O. Snell and Marie Snell, his wife, as Joint Tenants.''

On February 17, 1966, Derjke J. Telehala, defendant herein, recovered a $3,000 judgment against plaintiff's husband as damages for assault and battery.

An execution sale of the husband's interest in the above realty was stayed by a preliminary injunction issued out of the instant quiet title action which plaintiff filed on July 21, 1966, claiming to be the *sole* owner of the subject property under an oral agreement to this effect between her and her husband. He filed a disclaimer of any interest in the property.

 Plaintiff advanced two theories at the trial, (1) resulting trust[1] and (2) transmutation of funds used to buy the subject realty from the husband's community earnings to plaintiff's separate funds.

However, as the trial court pointed out, under either of these theories, "the central issue remains the presence or absence of an [oral] agreement between husband and wife."

Although the only testimony about an oral agreement was given by plaintiff, her husband, and the latter's brother, the trial court in its written "Opinion" stated: "The court is of the view, however, that the oral conversations and agreements asserted by plaintiff in reference to the subject property in fact never occurred; this is a fabrication in the expectation that it will prevent the execution sale of Mr. Snell's [husband's] interest in the Lake County Property."

The judgment of the trial court decreed that the title to the subject real property was in plaintiff and her husband "as joint tenants with the interest of each of said owner being equal and co-existive." The judgment further ordered that the preliminary injunction be dissolved. Plaintiff has appealed from said judgment and order.

As we are required to do, we shall state the facts in the light most favorable to respondent, Mrs. Telehala.

*Appellant testified as follows*: She married Snell on April 13, 1948; she loaned money to him both before and after marriage; on January 7, 1946 she and Snell opened a bank account in the names of "W. O. Snell or Mrs. Marie Gilmartin, as Joint Tenants"; on July 21, 1947, $2,000 was withdrawn from this account as a "loan" from appellant to Snell; the balance left in the account was $20.45, which was withdrawn on November 29, 1947; appellant also withdrew from her savings account, on May 12, 1947, the sum of $1,000 and loaned it to Snell; thus, at the time of marriage, Snell owed her $3,000; that after marriage, between July 9, 1948 and August 23, 1949, she withdrew from her savings account and loaned to Snell the total sum of $4,000; that said loans were never evidenced by any instruments in writing and she did not keep any record of them; that in the fall of 1952, Snell, who was a general building contractor, made a $10,000 profit on the construction of a building for a labor union; that

---

[1]Civil Code section 853 provides: "When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

Snell said he wanted to repay what he owed her; that she replied, "Go up to Lakeport and buy that property at Lakeport for me"; that he did so and returned to Oakland with an agreement signed by the owners, agreeing to sell the subject property for $6,000 to "William O. Snell and Marie Snell, his wife"; that she pointed out to Snell that "this doesn't show in my name alone, which it should be"; that Snell replied that the title company "had written it up that way" but that "[t]his is your property, and I want to show it that way, anytime you want to correct it, you go do it"; that on November 14, 1952 she and Snell went before a notary public in Alameda County and both signed the agreement of sale as "Purchasers"; that although she saw the deed after it was recorded and returned and she knew that she and Snell were named therein as "Joint Tenants," she did not do anything to correct the record title; that the $6,000 used to purchase the property came from the $10,000 earned by Snell on the building contract; that she and Snell maintained a joint checking account for the 10-12-year period prior to the trial herein in 1966 and that each contributed varying amounts thereto; that the taxes on the Lake County property were paid out of this account.

*Snell testified as follows*: that the records which he kept of the loans made to him by appellant both before and after their marriage were destroyed by fire in 1953 or 1954; that the money used in the purchase of the subject property came from the profit he made on a building construction job; that the amount of such profit was "a little over ten thousand dollars"; that "I wanted to give her a check for six thousand dollars" but she said "if I would just take it up [to Lakeport] and purchase" the property, "she would be happy"; she said property was to be bought in her name and "I said that is what I would do"; that "I paid a down payment of five hundred dollars, and a check of fifty-five hundred dollars for the purchase of the property"; that he discussed with appellant the fact that the agreement of November 13, 1952 called for the conveyance of the property to both of them; that he told appellant that this was in accordance with the desires of the Heinselmans (vendors), "That is the way they want to handle it, under a joint tenancy"; that the Heinselmans insisted on his name being on the agreement; that, following this discussion, the joint tenancy deed arrived by mail and he told appellant, "Now, this is a joint tenancy . . . I don't have any interest in this, only a record interest"; that

he further told her that if she wanted to change it, they could go to a title company and have the title put into appellant's name alone; that the title was never changed.

In the assault and battery action by respondent against Snell, respondent asked for punitive as well as compensatory damages and her counsel was therefore permitted to question Snell as to the nature and extent of his assets.

In his deposition, taken on October 25, 1965, Snell testified that he had two pieces of real property and two motor vehicles; that he had no intention of selling either piece of real property; that one of these pieces was the Lake County property (subject of the within action) and the other was the home on Brookdale Avenue, Oakland.

The following portion of Snell's deposition referring to the subject property was read to him: ''Q. Do you own some property in Lake County? A. I am buying it. Q. What is the address? A. 875 Martin Street. Q. What is your equity in that property? A. Two or three thousand dollars, I guess. I don't know. Q. What was the purchase price of the property? A. Five Thousand Dollars.''

He was then asked: ''Q. Well, you yourself had been the one that actually transferred the cash in payment of this property, hadn't you? A. I wrote the checks for it. Q. And you knew it was a total of six thousand dollars, wasn't it? A. I sure do. Q. Why did you answer two or three thousand, when the lawyer asked you how much equity you had in it? A. I didn't recall the situation at the time, that I took the deposition.''

Snell admitted giving the further testimony in his deposition: ''Q. How many years ago did you pay for it? A. I think we have owned it about—I am not sure, maybe fourteen or fifteen years. . . . Q. Anyone ever made you an offer on that property? A. No. Q. Have you ever placed it for sale? A. No. I didn't want to sell it. The fairgrounds wanted to buy it, but I didn't want to sell it. . . . I told them I wasn't interested in selling it.''

The foregoing testimony by Snell fully supports the following statement in the trial court's opinion: ''Husband's testimony that he had always recognized wife to be the actual owner of the Lake County property and that he had asserted no interest or claim thereto was clearly impeached.''

It is rather clear that the ''loan'' theory developed *after* Snell had given the foregoing testimony in the assault and battery litigation. Appellant admits that it was not until *after* that litigation commenced, in 1965, that she attempted to sup-

port the loan theory by making notations in the two bank passbooks for the two accounts from which the "loaned" amounts were withdrawn.

If the $7,000 withdrawn by appellant during the period from July 21, 1947 to August 23, 1949 was indeed a loan to Snell in that amount and Snell's payment in November 1952 of $6,000 was a partial repayment on such loan, it is indeed difficult to understand the following excerpt from appellant's testimony: "Q. What is your best recollection, your best estimate, as of the date he paid back that last $1,000.00? A. Well, I actually don't remember. I didn't recall. Because I didn't keep a record of it. Q. We understand you kept no records of it. Tell us, as best you can, about how long after the purchase of the Lakeport property that he paid that last $1,000.00 back to you. A. I don't remember anything about that $1,000.00. I don't remember."

One of the most glaring discrepancies in the testimony produced by appellant is the explanation as to why Snell was joined with appellant as the purchasers under the agreement of sale executed by the vendors and then by appellant and Snell.

The first explanation was that the *title company* drew up the agreement of sale in such manner because "this was the way to do it." Snell offered another explanation at trial.

He testified that it was the Heinselmans (vendors) who desired that the property be held in joint tenancy. "I signed that [agreement of sale] with the understanding that this was the desire of the Heinselmans, what they wanted, *before they would consummate a deal to sell this property to her. . . .* Q. Did you tell them that you were purchasing the property with your wife's money, on her account? A. I did. Q. But they *insisted* that you have your name on that contract? A. *Yes.* There was some reason for it. I don't know why." (Italics added.)

The foregoing testimony prompted the trial court to make the following observation in his opinion: "Husband's explanation as to how it occurred that his name appeared on the deed as one of the grantees as joint tenants is completely illogical. Certainly no reason appears why the grantor under a cash 'deal' would insist that the grantees appear as joint tenants."

Albert Snell, brother of William, testified to the burning down of a plant in Pittsburg in which he and William were each one-fifth partners; that the record room was destroyed in

such fire; that on September 4, 1952, William paid him $2,255.09 for his one-fifth interest in the plant; that appellant put money into the plant, the amount running into the thousands; that this money was a loan, to be repaid; that in the presence of William and himself, appellant stated that the Lake County property was purchased by William for her.

The trial court made this pertinent observation in its opinion: "It is not contended, nor was there ever offered, any *written* agreement between husband and wife relating to the theories of plaintiff's complaint. Such an *oral* agreement between husband and wife is easy to assert and very difficult to disprove." (Italics added by trial court.)

Our Supreme Court, in *Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147], laid down the respective provinces of the trial court and the appellate court in a situation such as we have in the instant case, as follows: ▮ "While it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted by the court as proof of the fact, this rule has its exceptions. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statement of the transaction; or there may be circumstances in evidence in connection with the matter, which satisfy the court of its falsity; the manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard his positive testimony as to a particular fact; and as it is within the province of the trial court to determine what credit and weight shall be given to the testimony of any witness, this court cannot control its finding or conclusion denying the testimony credence, unless it appears that there are no matters or circumstances which at all impair its accuracy." (P. 128. See also: *Hunter* v. *Schultz* (1966) 240 Cal. App.2d 24, 33-34 [49 Cal.Rptr. 315]; *Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 281-283 [25 Cal.Rptr. 837]; *Kurtz* v. *Kurtz* (1961) 189 Cal.App.2d 320, 324-325 [11 Cal.Rptr. 230]; *La Jolla Casa de Manana* v. *Hopkins* (1950) 98 Cal. App.2d 339, 345-346 [219 P.2d 871]; *Barham* v. *Khoury* (1947) 78 Cal.App.2d 204, 215 [177 P.2d 579].)

In *Hunter* v. *Schultz, supra,* appellant claimed that the trial court was required to accept the *undisputed* testimony of her husband that between four to five thousand dollars had been expended for improvements on the real property involved. The appellate court said: "The trial judge was justi-

fied in considering that Melvin, as a one-fourth owner and as the spouse of another one-fourth owner, had an obvious interest in the amount to be allowed for improvements. The credibility of Melvin's testimony could also properly be weighed in the light of the circumstance that he could produce receipts for only $1,862.10 of the claimed expenditures but could not produce any kind of corroborative evidence in verification of the claimed balance. The trial judge observed the witness on the stand, was in a far better position that we are to evaluate the trustworthiness of his 'best estimate,' and in the final result was the arbiter of his credibility." (240 Cal.App.2d at p. 34.)

In *Kurtz* v. *Kurtz, supra,* appellant wife complained about the amount of support money allowed to her and contended that, since her testimony that she is ill and unable to work is *uncontradicted,* the findings of the trial court must be in accordance with her uncontradicted testimony. This contention was rejected, the court commenting: "By her own testimony, she had worked steadily for many years, despite the same condition which she now claims prevents her from working. No medical corroboration was offered as to her physical or mental condition or to support her statement that she is unable to work. No excuse was offered for the failure to produce her doctor." (189 Cal.App.2d, at p. 325.)

In the *La Jolla* case, *supra,* the court stated the rule which has been consistently adhered to by the appellate courts: "An appellate court cannot control a finding or conclusion denying credence, unless it appears that there are no matters or circumstances which at all impair the accuracy of the testimony, and a trial judge has an inherent right to disregard the testimony of any witness, or the effect of any prima facie showing based thereon, when he is satisfied that the witness is not telling the truth or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness. All of these things may be properly considered in determining the weight to be given the testimony of a witness although there be no adverse testimony adduced." (98 Cal.App.2d, at pp. 345-346.)

The foregoing authorities amply support the trial court's decision in this action and the following somewhat rhetorical questions bring this out very clearly.

1. Why would the vendors in a *cash* sale of the subject property *insist* that the conveyance be made to both appellant and her husband, especially when the husband advised them

that he was buying the property for his wife and that it was hers alone? For that matter, why would the title company draw the deed as it did, when the husband had advised it to the same effect?

2. Why did not appellant present independent testimony as to what Snell told the vendors and the title company, or at least show why such testimony was not available?

3. Why did Snell testify in his deposition in the assault and battery action that he was "buying" the Lake County property for $5,000 and that his equity therein was "two or three thousand dollars, I guess," when he knew that he himself had written the checks to pay for the property and that the purchase price was $6,000?

4. Why did appellant sign the "Agreement To Sell Real Property" when she knew and discussed beforehand that such agreement provided for the sale to be made to "William O. Snell and Marie Snell, his wife, hereinafter called Purchasers"?

5. Why, after the joint tenancy deed was recorded and mailed to her and her husband, did not appellant take any steps to correct the record title so as to show the true ownership?

6. Why, if the subject property were the sole and separate property of appellant, were the taxes on said property paid out of community funds?

We think that the trial court was amply justified in concluding that appellant failed to sustain the burden of proving that, contrary to the deed of acquisition, she is the sole owner of the subject property and that her husband has no ownership interest therein.

The judgment and order appealed from are affirmed.

Shoemaker, P. J., and Taylor J., concurred.

A petition for a rehearing was denied July 17, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 13, 1969.