HARLAN E. MOORE CHARITABLE TRUST, Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

No. 93–1842.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1993.

Decided Nov. 3, 1993.

Richard T. West, Tracy J. Nugent (argued), Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, Champaign, IL, for plaintiff-appellee.

Richard Farber, Gary R. Allen, Curtis C. Pett (argued), Dept. of Justice, Tax Div., Appellate Section, Benjamin R. Norris, Dept. of Justice, Tax Div., Washington, DC, Byron G. Cudmore, Asst. U.S. Atty., Office of the U.S. Atty., Springfield, IL, Mark Winer,

David H. Hoff, Asst. U.S. Atty., Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for defendant-appellant.

Thomas C. Walsh, James C. Reynolds, Jr., Juan D. Keller, Bryan Cave, St. Louis, MO, for amicus curiae John C. Proctor Endowment.

Before POSNER, Chief Judge,
CUMMINGS, Circuit Judge, and
FAIRCHILD, Senior Circuit Judge.

POSNER, Chief Judge.

Ever since 1950, the unrelated business income of charitable organizations has been taxable, 26 U.S.C. § 511, the purpose being to remove the advantage that tax-exempt organizations enjoyed in competing with ordinary business firms. (For example, universities had been engaged in the manufacture of automobiles and chinaware and in the operation of theaters and oil wells.) *United States v. American College of Physicians,* 475 U.S. 834, 837–38, 106 S.Ct. 1591, 1593–94, 89 L.Ed.2d 841 (1986). Excluded from the concept of unrelated business income, therefore, was passive investment income, including—in the original provision—"all rents from real property." 26 U.S.C. § 512 (1950). But with "rents" undefined, this provision was an invitation to taxpayers to recharacterize business income as rental income. So in 1969 Congress decided to levy the unrelated business income tax on rent from real property "if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales)." 26 U.S.C. § 512(b)(3)(B)(ii).

■ We are asked to decide whether the "rent" that the owner of farm property receives under a typical sharecropping contract is unrelated business income. The question may seem esoteric, but it appears that a number of tax-exempt organizations own farmland that are farmed under sharecropping contracts. The only appellate cases, *United States v. Myra Foundation,* 382 F.2d 107 (8th Cir.1967), and *State National Bank v. United States,* 509 F.2d 832 (5th Cir.1975),

deal with the unrelated business income tax provision as it stood before the 1969 amendment.

The Harlan E. Moore Charitable Trust owns a 400–acre farm in Illinois managed by a local bank. A form contract captioned "Farm Lease—Grain Plan" denotes the trust as "owner" and a farmer named Steven Dodge (at first with his father-in-law, another farmer, but we can disregard that detail) as "tenant." The owner promises to give the tenant the possession of the farmland and farm buildings, to maintain the buildings, to pay all taxes and insurance on the land and buildings, and to contribute half the cost of seed, herbicides, insecticides, fertilizers, soil tests, and electricity for drying the grain. In exchange, the tenant promises to deliver to the owner at the local grain elevator one-half of all grain produced on the farm. The tenant also promises to run the farm in a businesslike manner and to submit to the owner's directions regarding crop rotation, participation in government farm programs, and like matters. The provisions reserving control in the owner are boilerplate. In practice, Dodge, rather than a bank employee acting as the trust's agent, makes the decisions on how to run the farm. The district court, in this suit for refund brought by the trust, held that the trust's rental income was not subject to the unrelated business income tax.

Were it not for the trust's undertaking to defray half the cost of some of the production expenses—seed, fertilizers, herbicides, etc.—it would be plain that the sharecropping contract was a genuine lease of the farmland owned by the trust and that the lease yielded rental income within the meaning of the unrelated business income tax provision. For the rent, which is to say the compensation paid by the tenant to the owner for the use of the owner's land, would then be a fixed percentage—50 percent—of the receipts. Stating the rent in percentage rather than absolute terms allows the parties to the lease to share the risk of fluctuations in the size and market price of the farm's crop. Cf. Stuart M. Saft, *Commercial Real Estate Leasing* § 3.05 (1992) (rent-escalation clauses). The percentage, it is true, is of the grain, not of

the receipts from the sale of the grain. But we cannot understand what difference that can make, and we do not understand the government to be arguing that it does make any difference. The provision for payment of rent in kind rather than in cash merely allows each party to decide on the best time for selling his share of the grain.

■ The government argues that the trust agreed to pay half the cost of producing the grain. If true, this would make a difference. The statute distinguishes between profits and sales (receipts). Profits are sales net of cost. If the trust is receiving half the sales revenue and paying half the cost, it is receiving half the profit, and that is unrelated business income even if called "rent." But the trust is not paying half the cost. It is paying half of some costs. The record is silent on the total cost of producing grain on the trust's farm. The government does not care. Its position is that anything more than a *de minimis* contribution by the owner to the cost of producing the farm's output transforms a sharecropping contract from a true lease to a partnership.

■ This position reflects a certain innocence about leasing in general and sharecropping in particular. A pure cash lease of commercial real estate, in which the owner's return is completely independent of the tenant's business success (unless the tenant should plunge into bankruptcy), is at one end of the spectrum of divided rights in real property at the other end of which is a merger of the real estate and the business into a single enterprise jointly owned by the former owner of the real property and the former tenant farmer. At some point along this spectrum a lease turns into a partnership, *State National Bank v. United States, supra; Duff v. Baker,* 78 Iowa 642, 43 N.W. 463 (1889), but the government is wrong to think this happens as soon as the transacting parties take the tiniest step away from the pure cash lease. Leases that no one would doubt were bona·fide involve some, and sometimes considerable, sharing of business risks between landlord and tenant to their mutual benefit. We mentioned rent-escalation clauses, which shift some of the risks of inflation and fluctuating real estate values

from landlord to tenant. There are many other examples. See, e.g., Saft, *supra,* § 4.02. A percentage lease of a store in a shopping center, the percentage being of the store's sales revenues, is a common example; also common is the landlord's agreeing to pick up some of the tenant's ·costs, *tenant's* costs in the sense that they would not be incurred if the ·property were vacant—electricity and water are examples. Since these are variable expenses, shifting. them to the owner shifts some of the uncertainties of the tenant's business from the tenant's shoulders to the owner's, but without transforming the lease into a partnership.

Sharecropping or share tenancy—tenant farming in which the rent is a fraction of the crop rather than a fixed amount of money— is an ancient institution and one found in many parts of the world. See, e.g., John Stuart Mill, *Principles of Political Economy,* bk. 2, ch. 8 (1909 ed); J.–C.–L. Simonde de Sismondi, *New Principles of Political Economy* 159–67 (Richard Hyse trans. 1991); Steven N.S. Cheung, *The Theory of Share Tenancy* (1969). The terms of sharecropping contracts vary, but a common arrangement, and the one here, is for the owner of the farmland to contribute the land and the buildings, the tenant farmer to contribute the farm labor and the farm equipment, and owner and tenant to split the crop fifty-fifty. When the contributions of the owner and the tenant are not equal, either the shares can be adjusted, which is common, Donald L. Winters, "Tenant Farming in Iowa, 1860–1900: A Study of the Terms of Rental Leases," 48 *Agr. Hist.* 130, 135 (1974), or costs normally borne entirely by one of the parties can be shared, which is also common. *Id.* at 135–36. So if the land does not contribute as much value as the labor, but the parties prefer not to alter the fifty-fifty split of the crop, the balance can be restored by requiring the owner to pick up some of the costs that would normally be borne by the tenant. The defraying of these costs reduces, in ·effect, the owner's rent. But it does not transform the owner's interest from a passive to an active one. It would be otherwise if the owner paid the farmer a salary and kept the whole crop.

The government does not suggest that charitable trusts and other tax-exempt organizations to which the unrelated business income tax provision applies are buying up farm property so that they can enjoy an edge in competing with owners of farmland who have to pay income tax on their rental income, or that when the unrelated business income tax provision was first added to the Internal Revenue Code these organizations abandoned their existing unrelated businesses in favor of farm ownership. Tax-exempt organizations that happen to own farmland, like other nonfarmer owners of farmland, lease the land, and sharecropping is a common form of agricultural lease—perhaps the most common. Douglas Allen & Dean Lueck, "Contract Choice in Modern Agriculture: Cash Rent versus Cropshare," 35 *J. Law & Econ.* 397, 399 (1992); Peter Murrell, "The Economics of Sharing: A Transactions Cost Analysis of Contractual Choice in Farming," 14 *Bell J. Econ.* 283 (1983). It is common, economists conjecture, in part because it shares with partnerships the agreeable feature of risk sharing, Cheung, *supra*, at 68 (this as we said is a common function of leases and does not transform them into partnerships), in part because it reduces the cash-flow demands of the tenant (so it is a form of lending by landlord to tenant), in part because it reduces the costs of renegotiating the lease when crop prices change, and in part because it reduces the tenant's incentive to overwork the soil, since half the benefit of his overproduction would enure to the landlord rather than to himself. Joseph D. Reid, Jr., "Sharecropping as an Understandable Market Response: The Post–Bellum South," 33 *J. Econ. Hist.* 106, 125 (1973); Allen & Lueck, *supra*, 35 *J. Law & Econ.* at 401–02, 409–10; Douglas W. Allen & Dean Lueck, "The 'Back Forty' on a Handshake: Specific Assets, Reputation, and the Structure of Farmland Contracts," 8 *J. Law, Econ. & Org.* 366, 374–75 (1992). All these objectives have counterparts in ordinary commercial leases. And the government does not suggest that a sharecropping agreement is classified as a partnership for any nontax purpose, such as liability; we are pleased to note that the government has *not* attempted to build an argument on the fact that the words for cropsharing and partnership are the same in the Philippine language. Murrell, *supra*, 14 *Bell J. Econ.* at 289–90.

But of course the unrelated business income provision might sweep in certain income that no state would deem partnership income. We must attend to the particulars of the statute. It classifies rent as unrelated business income if the amount of the rent depends, even in part, on income or profit rather than sales or receipts. The government fastens on "in part," arguing that these words make the fact that the trust is not picking up half the total cost of running the farm irrelevant. But "in part" goes with income, so the question is whether the sharecropping lease with cost sharing makes the owner's return dependent in part on the income from the farming operation. It does not. The income from the farming operation depends on all the costs incurred in the operation, not just those the trust has agreed to share. Even if the farmer's time (probably the largest cost in an economic sense) is excluded from consideration because it is not a cost that the farmer could deduct from his income or that would be reflected on any books of account, Dodge still has many expenses beyond those the trust agreed to share. A modern grain farmer owns or leases expensive equipment. He incurs costs for fuel and repairs. Often he employs farm workers. The income from his farming operation depends critically on these expenses. He could have zero income one year, yet the owner of the land have a positive return. There is a positive correlation between the income of the farm and the rent to the landowner, because a bumper crop is a plus factor for both. But the statute expressly permits rent to be figured as a percentage of sales, even though sales and profits usually are positively correlated. Hence the mere fact of a positive correlation between rent and income—the correlation that is likely to exist even if the entire rent is a fixed percentage of sales or receipts—does not bring rent under the statute. The "in part" provision appears to be aimed at nothing more subtle than leases in which the rental is stated as the sum of a fixed component and a percentage of the tenant's profits. See Treas.Reg. §§ 1.512(b)–1(c)(2)(iii)(b), 1.856–

4(b)(3). That is not the character of the lease in this case.

We do not believe that the provision defining "rent" for purposes of the unrelated business income tax was intended to bring about a revolution in agricultural or any other domain of leasing. It was intended to arm the Internal Revenue Service against efforts to reclassify business income as rent. That was not what the parties to this sharecropping contract were doing. The judgment of the district court is

AFFIRMED.