In re Walter E. FAZZIO and Elvira V. Fazzio, Debtors.

Walter E. FAZZIO and Elvira V. Fazzio, Plaintiffs,

v.

Jan RARICK, Defendant.

Bankruptcy No. 284–02815–A–11.
Adv. No. 93–2318.

United States Bankruptcy Court, E.D. California.

April 6, 1995.

John M. O'Donnell, Hefner, Stark & Marois, Sacramento, CA, for plaintiffs Walter E. Fazzio and Elvira V. Fazzio.

Thomas W. Olson, Jr., Sacramento, CA, for defendant Jan Rarick.

## MEMORANDUM DECISION

DAVID E. RUSSELL, Chief Judge.

This case involves the division of sales proceeds of real property owned by two tenants in common where one of them had not set foot on the property for many years. The property in question is located in Yuba County near Marysville, California and primarily used as a rice farm ("Rice Ranch" or "the property"). As many Northern Californian hunters know, rice farms attract ducks, and therein lies the beginning of our tale.

### FACTUAL BACKGROUND

Walter E. Fazzio ("Fazzio") was a duck hunter [1]. His executors and the conservators of his wife, Elvira Fazzio, are now the plaintiffs in this adversary proceeding to determine the rights of the bankruptcy estate to the sales proceeds of farm land ("the property" or "Rich Ranch") used to hunt ducks. The defendant is Jan Rarick, the widow of Dr. Ivan Rarick. The good doctor, like Fazzio, was an avid duck hunter. As far as is known to the court, all of the male owners of the Rice Ranch mentioned herein purchased

1. Mr. Fazzio died after the trial of this matter.

their partial interests in the Rice Ranch so that they could hunt ducks.

Fazzio initially acquired a one-half interest in the 362 acre Rice Ranch on behalf of himself and his wife when he purchased it with Jack Sellers ("Sellers") in March of 1969 for $362,000. They put up $100,000 in cash and financed the balance of the purchase price with two promissory notes secured by deeds of trust recorded against the property. The first deed of trust in priority secured a note in the principal amount of $120,000 held by the Federal Land Bank ("FLB"). The second deed of trust secured a loan from Michaels & Sullivan for $142,000. Fazzio and Sellers agreed that they were each responsible for one-half of the loan payments.

In 1970, Sellers and Fazzio sold a one-eighth interest in the Rice Ranch to Dr. Ivan and Jan Rarick ("Raricks") and a one-eighth interest to Larry E. Tripp ("Tripp"). The Raricks and Tripp each contributed $23,000 as a down payment towards the purchase of their interests in the Rice Ranch, and assumed their proportionate share of the loan obligations. After the sale, Sellers and Fazzio each owned undivided three-eighths interests while the Raricks and Tripp each owned an undivided one-eighth interest.

Thereafter, at some time before 1977, Sellers sold two-thirds of his remaining interest (¼ interest in the property) to Fazzio and the other one-third (⅛ interest in the property) to Tripp, giving Fazzio a five-eighths total interest and Tripp a one-fourth interest. The Raricks retained their original one-eighth interest. On December 11, 1977, Dr. Ivan Rarick died, leaving his wife, Jan Rarick ("Rarick") as the sole owner of their undivided interest in the Rice Ranch.

From the time of its acquisition and up to 1979 all of the male cotenants, who were friends, used the Rice Ranch for duck hunting, and after Dr. Rarick's death his sons hunted for a few years. Up until Dr. Rarick died, the owners had an oral agreement that each would be responsible for the hunting and maintenance expenses and the loan obligations in proportion to their ownership shares. Since Fazzio was an experienced

rice farmer, they also agreed that he would oversee the growing of rice on the property to generate income to help defray the joint expenses. Finally, they agreed that Fazzio would otherwise be responsible for the management and control of the Rice Ranch and the payment of its obligations, as well as provide an annual accounting. Fazzio agreed to these duties because he considered his fellow cotenants as friends who mutually enjoyed the sport of duck hunting.

After Dr. Rarick's death, Tripp commenced a judicial partition action requesting that the Rice Ranch be sold and the proceeds divided amongst the cotenants. In order to avoid the loss of the Rice Ranch, Fazzio agreed to purchase Tripp's one-quarter interest, but he needed to rearrange the financing. He got the FLB to agree to advance additional funds and got Michaels & Sullivan to agree to subordinate their deed of trust to FLB's new loan.

The transfer of interests was completed in March of 1979. According to FLB's closing loan statement, the new loan was for $300,000. Of that sum, $18,000 was being withheld for capital stock[2] and another $115,636.10[3] was withheld to pay off the balance of the original loan. The new loan thus provided additional funds of $166,363.90, which were insufficient to pay Tripp and his wife the agreed upon $177,649.12 for their interest in the Rice Ranch. In order to complete the transaction, Fazzio had to add $16,539.24 of his own funds so that closing costs, real estate taxes of $3,348.67, and Tripp could be paid. Although Rarick signed FLB's deed of trust so that it could be recorded, she did not sign the new promissory note.

After the sale of the Tripp interest Fazzio owned an undivided seven-eighths interest in the property and Rarick owned the remaining one-eighth. A watershed had also been reached in the relationship between the cotenants. All of Fazzio's duck-hunting buddies were gone and he and Rarick did not get along. Although he and his attorneys negotiated and tried to reach a formal agreement with Rarick, no agreement was signed. He decided to farm the Rice Ranch for his own account.

From 1979 to 1985, Fazzio agreed to let Robert E. Mohammed farm part of the Rice Ranch. Rarick gave her consent to the 1979 agreement (entitled a "lease" by the parties) with Mohammed, but was not consulted in respect to any later "leases." The agreements provided, in part, that Mohammed would plant 303.8 acres to rice for each crop season and that Fazzio would furnish all water needed for the crop. Fazzio also agreed to pay ⅛ of the cost of fertilizer, weed killer, herbicides, and insecticides used to grow the crop. In exchange, the agreements required Mohammed to deliver to Fazzio ⅛ of all the rice grown and harvested from the Rice Ranch.

From 1979 to 1989, Fazzio also farmed the Rice Ranch as an individual. He obtained crop loans to pay for the 1980 and 1981 crop years expenses. He participated in the Farmers Rice Cooperative and federal government farming subsidies. Until the sale of the property in July of 1989, Fazzio used the income from the farming operations to pay the operating and other expenses of the Rice Ranch.

Fazzio prepared annual spread sheets at the end of each year from 1979 through 1989 (exhibits 10 through 20, inclusive) describing each item of income or expense by type or check payee. Through 1985 the items were listed only by date. From 1986 through 1989, the items were listed by date and check number. Through 1986, the spreadsheets had four columns for expenses, farm or hunting operating expenses, or farm or hunting

---

2. Borrowers of FLB funds were required to use a set percentage of the loan proceeds to acquire "capital stock" of FLB. This "stock" never paid dividends, but was credited against the loan as it was paid down. Since interest accrued on the entire loan, including the portion used to acquire the capital stock, the interest rate paid on the funds actually received was always incrementally higher than stated in the promissory note. The stock "investment" is thus somewhat analogous to the "points" paid by the borrower in other loan transactions.

3. The total balance of the old loan was $6,000 more than the amount withheld to pay it off because $6,000 of "capital stock" was retired and credited to the old loan.

capital expenditures. For 1987 through 1989 (exhibits 18, 19 and 20), the spreadsheets contained income and expenditures for personal and other business ventures of the Fazzios, and the Rice Ranch transactions were spread to only two columns, one for expenses and the other for rice income. The court is satisfied that the spreadsheets represent the Rice Ranch business records and were properly maintained. Furthermore, the spreadsheets allocated the expenses in the same manner used prior to 1979 to account to the coowners.

The total income (including the proceeds from the crop-share arrangement with Mohammed) from the rice crops from 1979 through July of 1989 was $652,738. The total expenditures, not including a disputed claim by Mohammed for $32,000, were $657,266. A summary of the annual expenditures for hunting expenses and hunting capital expenditures as taken from the spreadsheets is attached as Table I to this Memorandum. A separate column for real property taxes paid has been included; the payment for 1982 represents part of a $15,000 payment listed on the spreadsheet (exhibit 13) as having been made to the FLB. There was only one payment made on the Michaels & Sullivan note secured by the second deed of trust on the property and it was put in the Hunting Capital Expenditure column. Except for payments made on the FLB loan, the expenditures listed on Table I, totalling $76,284, represent all of the cotenancy obligations paid by Fazzio for the years in question. There is no showing that other expenditures which Fazzio listed in the spreadsheets as farming expenses, such as those listed on Exhibit C attached to the Alternative Direct Testimony Declaration of Marnie L. Yorton, are not attributable to the farming operations or were ever agreed to by any of the other coowners at any time as proper expenditures related to maintaining the duck hunting facilities.

Fazzio made sporadic payments to the FLB over the years. Those payments, as

4. Fazzio made a payment of $15,000, but $12,-762 was credited to advances made by FLB to

shown on the spreadsheets, are summarized as follows:

| Year | Exhibit No. | Amount |
|------|-------------|--------|
| 1980 | 11 | $ 24,600 |
| 1981 | 12 | 32,408 |
| 1982 | 13 | 2,238[4] |
| 1983 | 14 | 78,735 |
| 1987 | 18 | 45,000 |
| 1988 | 19 | 45,000 |
| Total | | $227,981 |

Fazzio filed a chapter 11 petition on August 10, 1984. Pursuant to the terms of a confirmed plan, the Rice Ranch was sold on July 13, 1989, for a gross sales price of $900,000. Plaintiff's exhibit 37 is a copy of the seller's closing statement dated July 13, 1989. That closing statement shows that the net proceeds from the sale were $196,501.

FLB was paid $513,355 to clear their lien. The total of other charges against the sellers paid from escrow, after deducting an additional $120 paid in by the buyer, was $190,-144, which included $93,750 in property taxes, $53,862 to Michaels & Sullivan, $40,000 to Andrew and Sharon Siller and Samuel Shintaffer for court allowed expenses, and other miscellaneous costs of sale. Rarick does not dispute that she is responsible for one-eighth (⅛) of the non-FLB charges of $190,144 paid from escrow.

Fazzio contends and Rarick disputes that he is entitled to reimbursement from Rarick for her prorata share of the cotenancy obligations he paid from 1979 until the property was sold. Rarick contends and Fazzio disputes that she is entitled to her pro rata share of the rice income. They also disagree on the proper allocation of the FLB obligation.

## DISCUSSION

### I. Rights of Cotenants

No one disputes that Fazzio and Rarick are tenants in common of the Rice Ranch. Under California law, co-owners of real property holding undivided interests, such as tenants in common, are considered "cotenants." Harry D. Miller & Marvin B.

Yuba County for real property taxes.

Starr, 5 *Current Law of California Real Estate 2d,* § 12.1 (1993) ("Miller & Starr"). Cotenancy gives each cotenant equal rights of use and possession of the commonly owned property, so that each has the right to enter upon and occupy the entire property, but none can be excluded from any portion of the property. *Id.* at § 12.2.

■ The rights of cotenancy allow one cotenant to seek reimbursement from other cotenants for their proportionate share of the expenses paid for the benefit of the common property. *Willmon v. Koyer,* 168 Cal. 369, 372, 143 P. 694 (1914). When payments are made by one cotenant for the benefit of the property, that cotenant is entitled to a lien against the interests of those cotenants who do not contribute their share. Miller & Starr at § 12.3 (citing *Higgins v. Eva,* 204 Cal. 231, 238, 267 P. 1081 (1928) and *Conley v. Sharpe,* 58 Cal.App.2d 145, 156, 136 P.2d 376 (1943)). No statute of limitations runs against such reimbursement liens, as Rarick contends. *Garcia v. Venegas,* 106 Cal. App.2d 364, 369, 235 P.2d 89 (1951).

■ A cotenant in possession ("CoTIP") who is collecting rents and profits from third persons for the use and occupancy of the commonly owned property is required to account for the amounts collected to a tenant out of possession ("CoTOP"). *McWhorter v. McWhorter,* 99 Cal.App. 293, 296, 278 P. 454 (1929). Of course, the collecting cotenant can deduct amounts paid for the preservation and protection of the property, such as taxes and other common obligations and necessary repairs and additions, during the period for which the rents were collected. *Ochoa v. McCush,* 213 Cal. 426, 2 P.2d 357 (1931).

■ However, in the absence of third party tenants, an ouster, or an agreement, a CoTOP is not entitled to rent or other reimbursement for a CoTIP's exclusive use and possession, because each cotenant is entitled to occupy all of the common property. *Pico v. Columbet,* 12 Cal. 414, 420 (1859). Furthermore, when a CoTIP derives profits from

the common property, the CoTOP has no right to a proportion of the CoTIP's profits. *Id.* at 420–21.

■ This rule is narrowly construed to protect only the "rents, issues and profits derived from the property **by means of the occupant's own labor.**" *Black v. Black,* 91 Cal.App.2d 328, 332, 204 P.2d 950 (1949) (citing *Pico,* 12 Cal. at 421) (emphasis added). The court held that a CoTIP "is not required to account to his cotenant for any portion of the revenues derived therefrom **so long as they are the fruitage of his own capital, labor and skill.**" *Id.* 91 Cal.App.2d at 334, 204 P.2d 950 (emphasis added).[5]

■ There is one widely recognized exception to the *Pico/Black* rule. If a CoTIP demands reimbursement (or contribution) for expenditures on behalf of the cotenancy, then the CoTOP is entitled to offset such expenses against the reasonable value of the CoTIP's use of the property. *Hunter v. Schultz,* 240 Cal.App.2d 24, 31, 49 Cal.Rptr. 315 (1966). The California Court of Appeals adopted the above exception to the *Pico/Black* rule in whole from the second series of *American Law Reports* which states:

> [When] a cotenant who has been in possession or use of the premises seeks to obtain contribution respecting improvements made, or amounts expended in protection or preservation of the property, the court ... may charge the claimant, defensively, with at least a part of the reasonable value of his occupancy or use, and **in some cases** may hold him accountable for profits realized from the premises, even though he could not otherwise be required to account or be held liable respecting any of such benefits.

*Hunter,* 240 Cal.App.2d at 31, 49 Cal.Rptr. 315 (citing W.W. Allen, Annotation, *Accountability of Cotenants for Rents and Profits or Use and Occupation* (§ 18), 51 A.L.R.2d 388, 454 (1957)) (emphasis added). The court can allow offset against any expenses for the

---

5. The *Black* court reasoned that the CoTIP of jointly owned land bears the risks of investing his labor and capital. "In taking all the fruit grown upon the land, [the cotenant in possession] received no more than his just share inasmuch as it

is no more than the reward for his own labor and capital to no part of which is his cotenant entitled." *Black v. Black,* 91 Cal.App.2d 328, 334, 204 P.2d 950 (1949).

benefit of the cotenancy, including payments to principal, interest, taxes and improvements. In other words, if one resorts to equity, one is required to do equity. *See Fundaburk v. Cody,* 261 Ala. 25, 72 So.2d 710 (1954) and *Roberts v. Roberts,* 136 Tex. 255, 150 S.W.2d 236 (1941).

## II. *Sharecropping or "Crop-share" Agreements*

■ Crop-share agreements between the CoTIP and third parties complicate the application of the above rules.[6] Whether a crop-share agreement is a lease or some other creature of contracts can determine which disbursements made by the CoTIP are reimbursable and which can be offset by the CoTOP, and which receipts CoTOPs can recover.

Courts have long grappled with the characterization of crop-share agreements. *Moore Charitable Trust v. United States,* 9 F.3d 623 (7th Cir.1993) (taxation case); *Harrelson v. Miller & Lux, Inc.,* 182 Cal. 408, 188 P. 800 (1920) (tenant-lessee rights case); *Smith v. Schultz,* 89 Cal. 526, 26 P. 1087 (1891) (rights of contracting parties case); *see also* Margaret Rosso Grossman & Thomas G. Fischer, *The Farm Lease in Bankruptcy: A Comprehensive Analysis,* 59 Notre Dame L.Rev. 598, 602 (1984) (noting that of three most common types of farm leases, crop-share agreements present most significant question of interpretation).

■ When a bankruptcy court interprets a farm lease or crop-share agreement, it must look to state law. *See Hazen v. Hospitality Assocs., Inc. (In re Hospitality Assocs., Inc.)* 6 B.R. 778, 780 (Bankr.D.Or. 1980); *see also Kearny Mesa Crossroads v. Acorn Invs. (In re Acorn Invs.),* 8 B.R. 506 (Bankr.S.D.Cal.1981). In 1920, the California Supreme Court found that mere characterization of a crop-share agreement as a

"lease" by the parties to the agreement was not controlling. *Harrelson v. Miller & Lux Inc.,* 182 Cal. 408, 410, 188 P. 800 (1920). Rather, the court found that the tenor of the whole agreement had to be considered; and such provisions as requiring the nonowner farmer to repair the land at his own expense, setting a definite term of three years, and reserving the right of reentry to the owner were sufficient to establish the intention of the parties to create a lease rather than a share-cropping agreement. *See also Smith,* 89 Cal. at 526, 26 P. 1087 (holding that tenancy is created where the crop-share farmer agrees to pay certain part of crop expressly as rent); *see generally* Grossman & Fischer, 59 Notre Dame L.Rev. 598.

■ Reviewing the provisions of the Fazzio–Mohammed crop-share agreement[7] together with the description of the instrument as a "lease" indicates that the agreement should be construed as a lease. The instrument repeatedly refers to Weemissum Land Company (Fazzio) as "Lessor" and Robert E. Mohammed as "Lessee." Furthermore, the agreement sets forth a definite term of one year, prevents Fazzio from interfering with Mohammed's farming operations, reserves exclusive hunting rights to Fazzio and his invitees, and provides for **rental** to Lessor of ⅛ of all rice grown and harvested from the property. However, the agreement also called for Fazzio to pay a portion of the costs of production, including **all** water needed for raising the rice crop and one-third (Fazzio's proportionate share) of the supply and application cost of fertilizer, weed killer, herbicides and insecticides.

■ If not for the property owner's undertaking to defray a portion of the costs of production (e.g., seed, fertilizers, herbicides, etc.), crop-share agreements could be construed as "genuine" leases and the lease

6. "Under a typical crop-share [agreement], the land owner supplies part of the equipment and inputs (such as seed, fertilizer, and other chemicals) necessary for the tenant to farm the land owner's land. In exchange, the land owner receives a share of the crops as rent." Margaret Rosso Grossman & Thomas G. Fischer, *The Farm Lease in Bankruptcy: A Comprehensive Analysis,* 59 Notre Dame L.Rev. 598, 600 (1984).

7. Debtor only submitted copies of agreements for years 1979 (Exhibit F), 1980 (Exhibit G), and 1981 (Exhibit H), although Debtor had crop-share agreements with Robert Mohammed for years 1979–1985. The three agreements were identical. The court assumes that all subsequent agreements between Debtor and Mohammed were based on identical terms to those in years 1979 through 1981.

revenues could be construed as "rental income" in the traditional sense.[8] *Moore Charitable Trust*, 9 F.3d at 624. Recognizing the implications of construing crop-share agreements as "leases" for taxation purposes, the Seventh Circuit noted that crop-share agreements fall somewhere on the "spectrum of divided rights of real property." At one end of the spectrum is the "pure cash lease of commercial real estate, in which the owner's return is completely independent of the tenant's business success," while at the other end is a "merger of the real estate and the business into a single enterprise jointly owned by the former owner of the real property and the former tenant farmer." The Seventh Circuit explains, "At some point along this spectrum a lease turns into a partnership." *Id.* at 625.

Similarly, where the CoTIP bears the costs of production, a crop-share agreement is more like a partnership than a lease, and the rent, consisting of a percentage of the crops, is thus technically derived from the occupying cotenant's own "labor, capital and skill." Under the *Pico/Black* rule therefore, Rarick, as the CoTOP in this case, is precluded from **recovering** a proportional share of the third party lessee's rent.

### III. *Allocating the Expenses and Offset*

■ Nevertheless, the *Hunter* court stated that when a CoTIP seeks contribution, CoTOPs are entitled to **offset** the value of use and occupation and "in some cases" offset rents and profits which they otherwise would not be entitled to receive. *Hunter*, 240 Cal.App.2d at 31, 49 Cal.Rptr. 315. Most of the cases following the rule as set forth in § 18 of 51 A.L.R.2d 388 only allowed CoTOPs to use the *value of use and possession* of the common property as an offset. *See, e.g., Cliett v. Scott*, 233 F.2d 269 (5th Cir. 1956); *Fundaburk v. Cody, supra; Richardson v. Kuhlmyer*, 250 S.W.2d 355 (Mo.1952); *Re Foster*, 139 Wash. 224, 246 P. 290 (1926); *Rose v. Holbrook*, 287 S.W.2d 914 (Ky.Ct. App.1956); *see also Potter v. Garrett*, 52 So.2d 115 (Fla.1951). Only a few cases cited in the note allowed the CoTOP to use the

CoTIP's **rents and profits** as an offset. *Kirsch v. Scandia American Bank*, 160 Minn. 269, 199 N.W. 881 (1924); *Hoverson v. Hoverson*, 216 Minn. 228, 12 N.W.2d 501 (1943); *see also Roberts v. Roberts, supra* (holding that occupying cotenant must account for the "fruits, rents and revenues received" from the common property before recovering reimbursement).

In the instant action, the total receipts from the farming operations were less than the total expenditures, and no evidence was adduced as to the rental value of the property. But except for the minor intrusion of Rarick's sons using the Rice Ranch to hunt on for one or two years after their father's death, Fazzio did have exclusive possession and use of the property, and some monetary value can be attributed to that use. Furthermore, the circumstances surrounding the FLB loan insert new factors into the equation.

It was Fazzio's unilateral decision to acquire an additional one-fourth interest in the property which necessitated the refinancing of the FLB loan. The new loan had a higher and variable interest rate and naturally required larger annual payments than the old loan. It is not clear whether Rarick went along because she had no other choice, or whether she decided to retain her interest for her own reasons. In any event, she permitted the recordation of the new deed of trust against her interest in the property and thus at least partially acquiesced in the new financing. It is clear, however, that she should only be responsible for her share of the old loan, and not one-eighth of the new FLB loan.

■ The parties did not reach a final agreement as to their respective percentages of the FLB loan. While there may be several potential ways to determine those percentages, the difference in the resulting percentages is small, and dividing the balance of the old note by 8 has the advantage of simplicity as well as being basically fair. That balance should include the FLB "capital stock" of $6,000, since if the loan had not been paid off,

**8.** Rental income may be defined as "compensation paid by the tenant to the owner for the use of the owner's land." *Moore Charitable Trust v. United States*, 9 F.3d 623, 624 (7th Cir.1993).

interest would have continued to accrue on the stock. It should also be noted that the new loan had $18,000 of stock, which makes the percentage of stock higher in the new loan. Since the new loan was not her idea, Rarick should only be charged for her one-eighth of the old loan's $6,000 of stock, or $750. Either adding the $750 to her share of the old loan of $14,454 (⅛ of $115,636.10) or by dividing the $121,636.10 of the old loan by 8 gives the amount she owes on the new loan of $15,204. Her percentage share of the new loan is thus $15,204 ÷ $300,000 or 5.068.

■ Fazzio received the additional net proceeds of the new loan of $166,364. $6,000 of the $18,000 FLB stock is attributable to the old loan, leaving $12,000 attributable to the new loan. The amount of the new loan attributable to the additional proceeds is thus $178,364 ($166,364 + $12,000) and the amount attributable to the old loan is $121,636 ($115,636 + $6,000). Fazzio is responsible for increasing the FLB loan by $178,364. That represents 59.45% of the new loan ($178,364 ÷ $300,000).

From 1979, when the FLB loan was refinanced, through 1988 FLB was paid $227,981 on its loan by Fazzio. Of that amount 59.45%, or $135,535, can be attributed to the "increased portion" of the FLB loan. At close of escrow, FLB was paid $513,355. 59.45% of that sum is $305,190. Of the total payments of $741,336 made to FLB on the new loan, $440,725 is attributable to the additional amount borrowed by Fazzio.

The original agreement between the duck hunters was that the ranch income was to be used to defray the cotenancy expenses of the property and to pay for the additional expenses incurred for preparing the property for the duck hunting activities. If the income were insufficient, the coowners agreed to pay their pro rata share of the deficit. An implicit factor in this arrangement, however, was the relatively low amount of the loans against the Rice Ranch. Except for the initial purchase of the property, new coowners and coowners increasing their equity share in the property did not finance their acquisitions by borrowing against the property. The percentage of income needed to service the loans against the property was thus relatively low.

When Rarick and Fazzio couldn't agree on how to allocate the expenses after Fazzio became the owner of ⅞ of the property, it doesn't seem unfair, particularly in view of the prior arrangement between the coowners, to require Fazzio to first apply the income to the expenses, and, if the farming operations were profitable, to permit him to keep the excess for his management of the property. In actuality, that's what happened. The $135,535 he paid for the increased portion of the new note that he was responsible for is approximately $100,000 more than the income deficiency from the farming operations and the $32,000 claimed by Mohammed.

Even though the farming operations were profitable and even assuming arguendo that the value of the use and possession of the 342-acre Rice Ranch from 1979 to 1989 exceeded the cotenancy expenses, Rarick is not entitled to recover the difference. In *Lanigir v. Arden*, 85 Nev. 79, 450 P.2d 148 (1969), the Nevada Supreme Court held that although the value of use and possession may have exceeded the amount sought by the occupying cotenant for contribution or reimbursement, the cotenant out of possession is entitled only to complete offset—not to recover the excess over cotenancy expenses. *Id.* at 81, 450 P.2d 148. The court reasoned:

> An offset for fair rental value should be an offset and nothing more.... To allow a claim for the excess fair rental value would tend to do away with the general rule that absent agreement or ouster a co-tenant in possession is not obligated to **compensate** the co-tenant out of possession for use of the land.

*Id.* at 81–82, 450 P.2d 148 (emphasis added). The Nevada Supreme Court also relied on § 18 of 51 A.L.R.2d 388 and *Hunter* in reaching its conclusion.

■ Since Fazzio was in exclusive possession of the Rice Ranch and used his own labor and expenditures to farm it, Rarick is not entitled to share in the profits from the Rice Ranch including any federal government farming subsidies Fazzio received. *Black v. Black*, 91 Cal.App.2d 328, 332, 204 P.2d 950 (1949).

Before giving Rarick any offsets for Fazzio's exclusive use of the Rice Ranch, her share of the sales proceeds is calculated as follows:

| | |
|---|---|
| ⅛ of gross sales price of $900,000 | $112,500 |
| Less payments from escrow agreed to be coowner obligations (⅛ of $190,144) | ( 23,768) |
| Rarick's ⅛ share of the sales proceeds before deduction of her share of FLB debt | $ 88,732 |
| Less Rarick's share of the FLB debt paid through escrow (5.068% of $513,354) | ( 26,017) |
| Rarick's share of the sales proceeds before contributions requested by Fazzio | $ 62,715 |
| Less Rarick's share of the cotenancy payments made by Fazzio per Table I (⅛ of $76,284) | ( 9,536) |
| Less Rarick's share of the FLB payments made by Fazzio ($227,981 × 5.068%) | ( 11,554) |
| Rarick's share of the net proceeds from the sale of the Rice Ranch before any offsets | $ 41,625 |

Rarick's share of the payments made by Fazzio total $21,090, or approximately $2,100 per year over the ten plus years from the refinancing to the sale of the 342 acre Rice Ranch. That amounts to a little more than $49 an acre per year for the 42.75 acres that represents ⅛ of the total acreage. Without the new loan, the farm income was apparently sufficient to service the old loans, pay for all of the duck hunting and other nonoperating expenses, and still realize a small profit. As shown by the willingness of the coowners to put up their money for the property, and the efforts of Fazzio to keep it, the Rice Ranch had significant value for duck hunters. All in all, a yearly rental of $17,100 for the exclusive possession and use of a 342 acre (at $50 an acre) rice farm with good duck hunting is quite modest.

The increased FLB loan had other repercussions. Annual interest of 7% on $120,000 is $8,400 and for ten years it would total $84,000. The payments that Fazzio made on the new FLB loan would have easily covered that interest and amortized the loan as well. The increased variable interest rate on the new loan also added substantial costs in servicing the new loan. And as previously noted, an additional $300,000 would have been available at close of escrow if the FLB loan had not been increased. Rarick's ⅛ share would have been $37,500.

In conclusion, Rarick should be entitled to offset the $21,090 of her share of coowner costs paid by Fazzio against the value of his essentially exclusive use of the Rice Ranch. Her share of the remaining net proceeds from the sale of the Ranch is thus $62,715.

The foregoing shall constitute the findings of fact and conclusions of law in this proceeding. A separate judgment shall be entered.

## ATTACHMENT
### TABLE I
#### COTENANCY PAYMENTS MADE BY FAZZIO

| YEAR | HUNTING EXPENSES | PROPERTY TAXES | HUNTING CAPITAL EXP | TOTAL FOR YEAR |
|---|---|---|---|---|
| 1979 | $ 1,813 | $ 6,320 | $ 1,177 | $ 9,310 |
| 1980 | 1,667 | 6,779 | 23,670[1] | 32,116 |
| 1981 | 5,263 | 0 | 0 | 5,263 |
| 1982 | 1,244 | 12,672[2] | 0 | 13,916 |
| 1983 | 1,230 | 0 | 8,649 | 9,879 |
| 1984 | 1,168 | 0 | 0 | 1,168 |
| 1985 | 1,120 | 0 | 0 | 1,120 |
| 1986 | 1,189 | 0 | 0 | 1,189 |

1. Two payments of $11,835 each made to Michaels & Sullivan, the holder of the note secured by the second deed of trust on the Rice Ranch. Rarick does not dispute that this was a cotenancy obligation.

2. The FLB paid the real property taxes due on the Rice Ranch in 1981 and 1982. According to a summary of the FLB loan activity prepared by Fazzio's accountant, Marnie L. Yorton (exhibit 42), this advance was credited on the loan when Fazzio made a $15,000 payment to FLB in December of 1982. The difference of $2,238 was credited to loan interest.

| YEAR | HUNTING EXPENSES | PROPERTY TAXES | HUNTING CAPITAL EXP | TOTAL FOR YEAR |
|---|---|---|---|---|
| 1987 | 1,148[3] | 0 | 0 | 1,148 |
| 1988 | 1,085[4] | 0 | 0 | 1,085 |

No cotenancy expenses were incurred in 1989, the year the property was sold. The total of cotenancy expenses listed above, which do not include the payments made on the Federal Land Bank loan, is $76,284.

3. Fazzio's worksheet (Exhibit 18) did not have a column for this expense for 1987. The major expense included in the column for hunting expenses in prior years, as shown on the prior years' worksheets, was for an annual payment to Cordua Irrigation District for water. There was a payment of $1,148 to Cordua Irrigation listed on Exhibit 18. It was also listed as "Hunting water" on the schedule entitled "Weemissum Land Company, 1987 Co–Tenant Expenses" attached to Exhibit C of the Alternate Direct Testimony of Marnie L. Yorton. The other expenses listed by Yorton on the 1987 attachment to Exhibit C had not been listed as hunting expenses by Fazzio in previous years.

4. Fazzio's worksheet (Exhibit 19) did not have a column for this expense for 1988. A payment to Cordua Irrigation was listed for $1,084.50 on the worksheet, and also listed as "Hunting water" on the schedule entitled "Weemissum Land Company, 1988 Co–Tenant Expenses" attached to Exhibit C of the Alternate Direct Testimony of Marnie L. Yorton. See footnote 3 above.